PER CURIAM.
 

 Jeffrey Allen Muehleman appeals his death sentence for the first-degree premeditated murder of Earl Baughman imposed after resentencing proceedings. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the sentence.
 

 FACTS AND PROCEDURAL HISTORY
 

 Jeffrey Allen Muehleman, who was eighteen years old at the time of the murder, was convicted in 1984 of the May 4, 1983, first-degree murder of ninety-seven-year-old Earl Baughman in Pinellas Park, Florida. After Muehleman’s motion to suppress his confessions was denied, he pled guilty. After the first penalty phase hearing, at which Muehleman’s counsel presented mitigation, including some mental mitigation, the jury recommended death by a ten-to-two vote. In the first sentencing order, the trial court found four aggravating factors and one mitigating factor, and sentenced Muehleman to death. On direct appeal after the first penalty phase hearing, Muehleman challenged his conviction and his death sentence, which were both affirmed.
 
 See Muehleman v. State,
 
 503 So.2d 310, 317 (Fla.), cert.
 
 denied,
 
 484 U.S. 882, 108 S.Ct. 39, 98 L.Ed.2d 170 (1987).
 
 [1]
 
 Upon postconviction review, however, this Court reversed the death sentence and ordered that a new penalty phase proceeding be held.
 
 Muehleman v.
 
 
 *1153
 

 State,
 
 833 So.2d 774 (Fla.2002) (table). When the 2002 order was entered, Muehle-man was pro se in this court, having been granted that right after a
 
 Faretta
 

 [2]
 

 hearing was held in the trial court during a period of relinquishment for determination of a public records issue.
 
 [3]
 
 The order reversing for a new penalty phase directed the trial court to “immediately advise Muehleman of his right to counsel.”
 

 The Second Penalty Phase Proceeding
 

 The new penalty phase trial was held June 23-24, 2003. Muehleman represented himself after being advised of his right to counsel at numerous pretrial hearings and after another
 
 Faretta
 
 hearing was held on May 19, 2003. At the second penalty phase proceeding, the State presented many of the same witnesses presented in the first penalty phase. In addition to evidence of the circumstances of the murder, the State presented victim impact evidence without objection — Joanne Wood, the victim’s granddaughter, and Jessie Battle, a grandson, who testified to the unique character of Earl Baughman and his loss to the family and the community.
 

 The testimony and evidence established the following facts. Jeffrey Muehleman, age eighteen, was hired as a live-in helper by Earl Baughman, a ninety-seven-year-old man who lived alone in Pinellas Park. Calling himself Jeff Williams or Williamson, Muehleman took the job on Monday, May 2, 1983, which involved helping Baughman around the house and driving him on errands in Baughman’s 1961 Cadillac. Muehleman drove Baughman’s Cadillac to a garage apartment that Muehleman rented from Marie and Jeff Woodward and the Woodwards saw him driving the vehicle.
 

 Virginia Peterson, a friend of Baugh-man, met Muehleman at the Baughman residence on Wednesday, May 4. Muehle-man drove Baughman and Mrs. Peterson to the bank where Baughman cashed his social security check. Muehleman was aware that Baughman had cashed a check for about $500 and decided some time that day to rob him. Later that same day, Muehleman took Baughman to Mrs. Peterson’s house where, unbeknownst to Muehleman, Baughman gave her all but about $150 of the money for safekeeping. Baughman’s daughter, Virginia Battle, met Muehleman at Baughman’s home on the evening of May 4, 1983.
 
 [4]
 
 He told her his name was Jeff Williams. She testified that everything seemed fine when she left.
 

 Sometime that night, Muehleman decided it was time to rob and kill Baughman. He had attempted to enlist the help of a friend, Richard Wesley, in a plan to kill Baughman, but when Wesley did not show up, Muehleman proceeded alone. After Baughman went to bed, Muehleman stood outside Baughman’s door for several hours thinking about what to do. He then took a frying pan from the kitchen and went into the bedroom where he struck Baughman
 
 *1154
 
 five or six times with it, splattering blood around the bedroom. Muehleman later reported most of the details of the crime to a jail inmate, Ronald Rewis. He told Re-wis that before he hit Baughman, he had set up the dining room table with coffee cups and crumbs to make it appear that Baughman had eaten breakfast there. He also told Rewis that when he hit Baugh-man, it made a “gong sound,” and Muehle-man laughed about it. At one point, Baughman was groaning and cried out, “Oh, Jeff.”
 

 When Baughman did not die after being hit repeatedly with the frying pan, Muehleman decided to strangle him. After he strangled Baughman for what Muehleman said “seemed like ten minutes,” Baughman was still breathing, and Muehleman decided to suffocate Baugh-man with plastic newspaper bags. He stuffed two bags down Baughman’s throat into his windpipe. After attempting to breathe through the plastic bags, Baugh-man finally died.
 

 Muehleman wiped down the house for fingerprints, cleaned the rug, removed bloody sheets from the bed and remade it, hid a blood stain on the curtain, and burned the sheets and Baughman’s wallet in the backyard. Muehleman tied a plastic bag around Baughman’s head to “collect some of the blood,” and placed him in the trunk of the Cadillac wrapped in a blanket. Muehleman took about $150 in cash, an engraved cigarette lighter, a hat, shoes, and some toiletries, all of which were later found by law enforcement officers in Muehleman’s possession. Muehleman also took an 1886 silver dollar that Baughman kept to commemorate the year of his birth, which Muehleman traded to Mrs. Woodward for some cigarettes.
 

 After watching TV until morning traffic started to pick up, Muehleman drove the Cadillac some distance into St. Petersburg to his garage apartment where he left the items he had taken. With Baughman in the trunk, Muehleman then drove around and finally left the Cadillac parked in front of an apartment complex where he locked the car, wiped it down to remove his fingerprints, took the keys, and returned home.
 

 When Baughman could not be located by his friends and family that day, a photograph of him and a description of the Cadillac were publicized on the news. Marie Woodward, Muehleman’s landlady, believed that Muehleman, whom she knew only as “Jeff,” worked for the missing man and notified law enforcement on May 6, 1983. Muehleman’s landlord, Jeff Woodward, also called the Sheriff’s office on May 6 and told deputies he had seen his tenant driving the Cadillac. An anonymous caller also called on May 6 and reported to deputies that the suspect was leaving the area of the apartment. Deputies went to the garage where Muehleman had been staying and found him returning from the store on a bicycle. Muehleman attempted to flee from deputies and hid his face, but was detained. He told deputies his name was Ed Buchanan, a name with initials that matched those on Baughman’s engraved lighter. After being given his Miranda
 
 [5]
 
 warnings, Muehleman admitted to working for Baughman and to taking some items from him, but denied knowing anything about his disappearance. Muehleman was arrested on charges of obstructing justice by false information on May 6 and continued to deny knowledge of Baughman’s disappearance. He invoked his right to remain silent on May 9, 1983.
 

 On May 14, 1983, the Cadillac was located and Baughman’s body was found in the trunk in a moderately decomposed state. The current medical examiner testified
 
 *1155
 
 that autopsy reports prepared by the former medical examiner in 1983 indicated Baughman died from suffocation, had a fractured hyoid bone in his throat and did not appear to have a skull fracture. Baughman still had two plastic bags stuffed down his windpipe. Baughman could have been alive for several minutes after the bags were forced down his throat.
 

 Muehleman continued to proclaim his innocence in several interviews he initiated with detectives, but ultimately gave detectives two taped confessions after being advised of his
 
 Miranda
 
 rights each time. He also confessed to jail inmate Ronald Rewis, who taped part of the conversation.
 
 [6]
 
 While in jail, Muehleman approached Rewis and began to discuss many details of the killing, including some not made public. Rewis approached jail authorities and agreed to secretly record any future conversations with Muehleman, although he contended he never raised the subject himself. On June 8, 1983, Muehle-man met with detectives, was informed of the evidence that had been gathered, and confessed in some detail. Muehleman told detectives that he did not decide to kill Baughman until after he had hit him with the frying pan and then realized he did not want Baughman to suffer. Muehleman was formally booked on a charge of first-degree murder. He also confessed to a
 
 St. Petersburg Times
 
 newspaper reporter, who printed the article on June 9, 1983. Muehleman requested another meeting with detectives on June 10, was again given
 
 Miranda
 
 warnings, and provided a final taped statement, adding more details of the crime.
 

 At the penalty phase trial, Muehleman represented himself. He presented no mitigation testimony or evidence and, at the conclusion of the proceeding, the jury recommended a sentence of death by a ten-to-two vote. Even though Muehleman presented no mitigation, the State’s sentencing memorandum outlined potential mitigation, including Muehleman’s age of eighteen at the time of the crime and his good prison record. Pursuant to
 
 Muhammad v. State,
 
 782 So.2d 343 (Fla.2001),
 
 [7]
 
 the State also provided the trial court with a summary of the mitigation evidence in the record, which was presented in the first penalty phase, including Muehleman’s medical and social problems from birth to the time of trial and the opinions of a clinical psychologist and a psychiatrist who testified in the first penalty phase.
 

 Muehleman appeared pro se at the
 
 Spencey
 

 [8]
 

 hearing held on September 5, 2003. When offered appointed counsel, he again declined and did not present any mitigation evidence or testimony. The trial court entered its sentencing order on October 10, 2003, finding five aggravating factors (although two were merged) and one statutory mitigating factor — the age of the defendant at the time of the crime (eighteen years old). The court concluded that Muehleman’s emotional age was not any different than his chronological age and gave the mitigator moderate weight. The aggravators found by the court were: (1) and (2) (merged) the murder was committed during a robbery; the murder was committed for financial gain; (3) the murder was committed to avoid lawful arrest or effect an escape; (4) the murder was especially heinous, atrocious or cruel
 
 *1156
 
 (HAC); and (5) the murder was cold, calculated and premeditated (CCP).
 

 The trial court found that “[t]he aggravating circumstances far outweigh the one mitigating circumstance of the Defendant’s age (18) at the time he committed the crime.” After weighing the aggravators against the mitigator, the trial court followed the jury’s ten-to-two recommendation and imposed a sentence of death.
 

 This Appeal
 

 Muehleman raises five main issues in this appeal: (A) whether the trial court disobeyed this Court’s order to immediately advise him of his right to counsel and whether the court correctly allowed Muehleman to represent himself; (B) whether the trial court reversibly erred in denying Muehleman’s motion to restore assignment of the case to the original presiding judge; (C) whether the trial court reversibly erred in permitting members of the State Attorney’s Office to read former testimony from now-unavailable witnesses who testified in Muehleman’s first penalty phase proceeding; (D) whether jail inmate and State’s witness Ronald Rewis was a state agent and whether his testimony was improperly admitted in violation of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and (E) whether cumulative error requires reversal. In addition to the claims asserted by Muehleman, the Court must also review the issue of proportionality of the death sentence.
 

 ANALYSIS
 

 Muehleman’s Self-Representation
 

 Muehleman contends that the trial court erred by failing to follow this Court’s September 17, 2002, order, which reversed for a new sentencing proceeding and directed the trial court to immediately advise Muehleman that he had a right to be represented by appointed counsel during his resentencing. He also contends that the trial court failed to hold a proper Faretta
 
 [9]
 
 hearing before allowing him to waive counsel and represent himself at his resentencing. We find no merit in either of these contentions. The record reflects that the trial court adequately followed our September 17, 2002, directive that Muehle-man be immediately advised of his right to counsel and that he was afforded a proper
 
 Faretta
 
 hearing before the commencement of the penalty phase trial.
 

 As noted earlier, Muehleman was granted leave to represent himself by the trial court in an order dated March 31, 1999, which was entered after a
 
 Faretta
 
 hearing held during relinquishment of jurisdiction from this Court. Even so, a defendant’s right to counsel applies at each crucial stage of the proceedings, and “[wjhere the right to counsel has been properly waived, the State may proceed with the stage at issue; but the waiver applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented.”
 
 Traylor v. State,
 
 596 So.2d 957, 968 (Fla.1992);
 
 see also Ibar v. State,
 
 938 So.2d 451, 469 (Fla.2006); Fla. R.Crim. P. 3.111(d)(5) (2003) (“If a waiver is accepted at any stage of the proceedings, the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant appears without counsel.”). As explained below, Muehleman insisted on his right to
 
 *1157
 
 represent himself throughout the resen-tencing proceedings, even though the trial court advised him of his right to appointed counsel at every critical stage in the proceedings and urged him to accept appointed counsel or standby counsel on several occasions due to the complexities of the proceeding and the serious nature of the possibility of a sentence of death. The record also reflects that the trial court held a proper
 
 Faretta
 
 hearing before allowing Muehleman to represent himself at his resentencing proceeding.
 

 On December 12, 2002, at the first hearing held after remand, the judge began by indicating that “one of the first things we need to determine right off the bat is an attorney.” Muehleman immediately cut off that line of discussion with his announcement that he was “not going to have one” and that he desired to represent himself. No formal
 
 Faretta
 
 hearing was held at that time, although the court did warn Muehleman that he was concerned about waiver of an attorney because Muehleman was facing another possible death sentence. At that same first pretrial hearing, the court also offered to appoint standby counsel for Muehleman, which he refused. The lengthy colloquy with Muehleman about appointed counsel, which occurred at the first hearing held after our order of remand, satisfied our directive that Muehleman be immediately advised of his right to counsel. Moreover, the trial court properly offered counsel to Muehleman at subsequent proceedings.
 

 During the January 21, 2003, pretrial hearing the issue of waiver of counsel was again discussed briefly. At the February 12, 2003, hearing the judge asked Muehle-man if he still wanted to represent himself and was advised that he did. The issue of standby counsel was again discussed, but none was appointed because Muehleman said he was looking into the possibility of private counsel. When the State asked the court to conduct another
 
 Faretta
 
 hearing, Muehleman immediately objected to any further
 
 Faretta
 
 inquiry, arguing that the prior
 
 Faretta
 
 inquiry “is still in force.”
 

 The State again asked that a
 
 Faretta
 
 inquiry be conducted at the April 15, 2003, pretrial conference and Muehleman again objected. He stated that the only thing that was required of the court was that he be offered assistance of counsel at each subsequent stage. Muehleman then stated, “The court has fulfilled it. It has been made clear that I am standing pro se.” At that same April 15 hearing, the trial court expressed concern that Muehleman had claimed brain damage in the first penalty phase. Muehleman responded that “[i]t’s waived” and “there is no present mental or medical reason that prohibits me from presenting this defense.” Muehleman did not raise any issue of competency in the proceedings below or in this appeal. When the trial court asked Muehleman to confirm that he wanted to represent himself, Muehleman did so, and further expressly rejected any standby counsel, even though the judge advised him he would be at a tremendous disadvantage in the resentenc-ing heai'ing without an experienced death penalty attorney available to assist him. When the State expressed concern about Muehleman’s rejection of counsel, Muehle-man again objected to any
 
 Faretta
 
 type inquiry.
 

 On May 16, 2003, the State asked the court to appoint counsel to consult with Muehleman about his expressed intent not to offer any mitigation. Muehleman objected to any counsel being forced on him and said, “There is nothing wrong with my present mental competence.” He made clear that he “opted this case out of state-provided representation.” The trial court again warned Muehleman that if he presented no mitigation at the new penalty
 
 *1158
 
 phase, he would have waived the right to ever present it.
 

 At the next hearing, on May 19, 2003, the trial court again offered Muehleman appointed counsel and indicated it would conduct a full
 
 Faretta
 
 inquiry at that time. Muehleman objected to the
 
 Faretta
 
 inquiry and refused to answer many of the questions posed to him. Muehleman now contends the inquiry that was conducted was inadequate. We disagree.
 

 At that May 19 hearing, the court advised Muehleman of his right to appointed counsel and asked him if he understood that an attorney would be appointed if he could not afford one. Muehleman would not respond. Muehleman did confirm having received a copy some years earlier of the charge against him, and said that he discussed the charge with the attorney representing him at that time. When asked if he understood the possible penalty was death, Muehleman confirmed that he knew the two possible penalties that could be imposed-death or life in prison. When asked if he had ever been diagnosed with or treated for a mental illness, he did not answer. The court asked Muehleman about his level of education and Muehle-man again did not respond, but confirmed that he could read and write. Muehleman refused to answer many of the questions posed by the court, but it was apparent on the record, from his pro se verbal and written appearances before the court, that he was articulate, understood the charges and possible penalty, knew various aspects of the law pertaining to the penalty phase, and knew that he had both a right to appointed counsel and a right to represent himself. Muehleman was also advised that a lawyer would possess experience and knowledge necessary in the case and that Muehleman would be at a great disadvantage if he represented himself. When the issue of standby counsel was again raised by the court, Muehleman objected to appointment of standby counsel and thus none was appointed.
 

 In addition to making the inquiry required by
 
 Faretta,
 
 the trial court also advised Muehleman that his stated “jurisdictional” objection to Judge Brandt Downey presiding over the case, rather than Judge Crockett Farnell, the original judge in the case, was not likely to be upheld on appeal and that Muehleman’s non-participation on this basis would be a waiver of his right to present mitigation. Muehleman confirmed that he understood this. At the conclusion of the
 
 Faretta
 
 inquiry, the court stated on the record that Muehleman was competent to represent himself, understood the significance of his actions, understood the nature of the proceedings, and was entitled to represent himself.
 

 On June 23, 2003, when the second penalty phase proceeding began with jury selection, the trial court again offered Muehleman the assistance of counsel, which he rejected. He was again offered, but rejected, counsel at the
 
 Spencer
 
 hearing on September 5, 2003.
 

 Clearly, Muehleman insisted on the right to represent himself throughout the proceedings. Under the United States Supreme Court’s ruling in
 
 Faretta
 
 and this Court’s precedent, “once an unequivocal request for self-representation is made, the trial court is obligated to hold a hearing, to determine whether the defendant is knowingly and intelligently waiving his right to court-appointed counsel.”
 
 Tennis v. State,
 
 997 So.2d 375, 378 (Fla.2008) (citing
 
 Hardwick v. State,
 
 521 So.2d 1071, 1074 (Fla.1988)). The Supreme Court stated in
 
 Faretta:
 

 The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his par
 
 *1159
 
 ticular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, ⅞⅛ choice must be honored out of “that respect for the individual which is the lifeblood of the law.”
 

 Faretta,
 
 422 U.S. at 884, 95 S.Ct. 2525.
 
 Faretta
 
 also advised:
 

 Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that “he knows what he is doing and his choice is made with eyes open.”
 

 422 U.S. at 835, 95 S.Ct. 2525 (quoting
 
 Adams v. United States ex rel. McCann,
 
 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).
 

 The United States Supreme Court in
 
 Indiana v. Edwards,
 
 — U.S. -, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), reaffirmed the importance of
 
 Faretta
 
 as the “foundational ‘self-representation’ case,” because the “Sixth and Fourteenth Amendments include a ‘constitutional right to proceed
 
 without
 
 counsel when’ a criminal defendant ‘voluntarily and intelligently elects to do so.’ ”
 
 Edwards,
 
 128 S.Ct. at 2383 (quoting
 
 Faretta,
 
 422 U.S. at 807, 95 S.Ct. 2525).
 
 Edtuards
 
 makes clear, however, that the constitution permits states to insist upon representation by counsel for those defendants competent enough to stand trial “but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.”
 
 Id.
 
 at 2388.
 

 Florida Rule of Criminal Procedure 3.111 also recognizes the right of an accused to represent himself or herself, and sets forth certain requirements that must be met before waiver of counsel may be found by the trial court. The rule provides in pertinent part:
 

 (d) Waiver of Counsel.
 

 [[Image here]]
 

 (2) A defendant shall not be considered to have waived the assistance of counsel until the entire process of offering counsel has been completed and a thorough inquiry has been made into both the accused’s comprehension of that offer and the accused’s capacity to make a knowing and intelligent waiver. Before determining whether the waiver is knowing and intelligent, the court shall advise the defendant of the disadvantages and dangers of self-representation.
 

 (3) Regardless of the defendant’s legal skills or the complexity of the case, the court shall not deny a defendant’s unequivocal request to represent himself or herself, if the court makes a determination of record that the defendant has made a knowing and intelligent waiver of the right to counsel.
 

 We noted in
 
 Tennis
 
 that the Supreme Court in
 
 Edwards
 
 gave trial courts more discretion in the context of a
 
 Faretta
 
 inquiry to examine a defendant’s mental competency and mental capacity to represent himself and that “in certain instances a defendant may be precluded from exercising his or her right to proceed pro se after the trial court conducts a
 
 Faretta
 
 inquiry.”
 
 Tennis,
 
 997 So.2d at 378.
 
 [10]
 

 
 *1160
 
 The record reflects that the trial court’s inquiry regarding Muehleman’s demands to represent himself and the court’s determination on the record met the requirements of both
 
 Faretta
 
 and rule 3.111, as modified by the considerations mandated by
 
 Edwards.
 
 The trial court ruled on the record, after the
 
 Faretta
 
 hearing held May 19, 2003, as follows:
 

 Pursuant to Faretta, again I will make a finding, as did Judge Farnell back, I believe, it was in March of '99, make a finding that Mr. Muehleman is competent to represent himself, he understands the significance of his actions, he understands the proceedings that we are going to be going into, he is educated, he can read, he can write, and under Faret-ta, he is certainly entitled to represent himself.
 

 The record in this case supports the judge’s findings and shows that Muehleman was lucid, literate, articulate, and appeared to have a clear understanding of what he was facing. We also emphasize that Muehleman has not alleged either in the trial court or this Court, nor does the record provide any basis to find, that he suffered from a “severe mental illness to the point where [he was] not competent to conduct trial proceedings by [himself].”
 
 Edwards,
 
 128 S.Ct. at 2388.
 

 “[O]nce a court determines that a competent defendant of his or her own free will has ‘knowingly and intelligently waived the right to counsel, the dictates of
 
 Faretta
 
 are satisfied, the inquiry is over, and the defendant may proceed unrepresented.” Herna
 
 ndez-Alberto v. State,
 
 889 So.2d 721, 729 (Fla.2004) (quoting
 
 State v. Bowen,
 
 698 So.2d 248, 251 (Fla.1997)). When that occurs, “[t]he court may not inquire further into whether the defendant ‘could provide himself with a substantively qualitative defense,’ for it is within the defendant’s rights, if he or she so chooses, to sit mute and mount no defense at all.”
 
 Id.
 
 (citation omitted) (quoting
 
 Bowen,
 
 698 So.2d at 251). Moreover, “[w]here a competent defendant ‘knowingly and intelligently’ waives the right to counsel ’'and proceeds unrepresented ‘with eyes open,’ he or she
 
 ipso facto
 
 receives a ‘fair trial’ for right to counsel purposes.”
 
 Potts v. State,
 
 718 So.2d 757, 759-60 (Fla.1998) (quoting
 
 Bowen,
 
 698 So.2d at 252).
 

 The trial court’s inquiry satisfied the constitutional predicate for allowing self-representation. It also provided the trial court with a proper basis to determine that Muehleman made a knowing and intelligent waiver of his right to appointed counsel. The record is replete with clear indications that Muehleman knew he had a right to appointed counsel, was offered counsel at every critical stage of the proceedings, and was advised of the risks of self-representation, but expressly and unequivocally rejected counsel in favor of self-representation at every turn. Muehle-man made clear, over and over, that he did not want counsel forced upon him and that it was his personal and constitutional right to represent himself. He rejected any concern that he had a mental deficiency that could affect his ability to represent himself. Muehleman made the choice “with eyes open,”
 
 see Faretta,
 
 422 U.S. at 835, 95 S.Ct. 2525 confirming to the trial court that he knew he was gambling his life on that self-representation.
 

 In this case, the fact that Muehleman was granted his request to represent himself, and subsequently chose to present no mitigation whatsoever, does not establish that the trial court erred in allowing him to follow that chosen path. The record supports a finding that Muehleman proceeded down that path voluntarily, knowing he was staking his life on the choices he made. Muehleman has demonstrated no error in the rulings of the trial court on
 
 *1161
 
 this issue and, accordingly, relief is denied on this claim.
 

 Claim of Error in Judicial Assignment
 

 Muehleman next claims that the trial court erred in allowing the resentenc-ing proceeding to be conducted by a circuit judge who did not hear the first penalty phase trial. Muehleman took the firm position in the trial court that Judge Brandt Downey, the judge who was assigned to handle criminal cases in the Sixth Judicial Circuit at the time of the resentencing, had no jurisdiction to preside over the resen-tencing proceeding because Judge Crockett Farnell presided over the first penalty phase proceeding and the postconviction proceedings.
 
 [11]
 
 Muehleman further refused, in large part, to “participate” in the proceedings below based on his erroneous belief that to do so would be waiving his jurisdictional claim. We disagree with Muehleman’s contention and conclude that the issue of jurisdiction is not implicated. Further, no error has been shown in the court’s refusal to reassign Judge Farnell to hear the case.
 

 First, as to Muehleman’s jurisdictional claim, this Court explained in
 
 Rodriguez v. State,
 
 919 So.2d 1252 (Fla.2005), that administrative orders of judicial assignment “do not limit the lawful authority of any judge of the court, nor do they bestow rights on litigants.”
 
 Id.
 
 at 1278 (quoting
 
 Kruckenberg v. Powell,
 
 422 So.2d 994, 996 (Fla. 5th DCA 1982)). At issue in
 
 Rodriguez
 
 was an internal court policy relating to judge assignments, while Muehleman complains here of an alleged violation of a rule promulgated by this Court, but the principle is the same. As a circuit judge, Judge Downey clearly had jurisdiction to preside over the case. Judicial assignment rules are “designed to promote judicial efficiency, so courts have wide discretion in this field.”
 
 Rodriguez,
 
 919 So.2d at 1278-79 (citing Jonathan L. Entin,
 
 The Sign of “The Four”: Judicial Assignment and the Rule of Law,
 
 68 Miss.L.J. 369 (1998)). The Court further explained in
 
 Rodriguez
 
 that “a litigant must establish prejudice from any improper judicial assignment.” 919 So.2d at 1278. Muehleman has not identified any prejudice that flowed from the chief judge’s refusal to reassign Judge Farnell to preside over the resentencing. Muehleman’s suggestion that Judge Farnell’s “institutional knowledge” of the case was lost in the resentencing does not support a claim of prejudice. Because resentencing occurred after a new penalty phase jury trial, the sentence could not be based on a judge’s prior knowledge of the facts of the case or of the aggravating or mitigating factors.
 

 Muehleman also argues that Florida Rule of Criminal Procedure 3.700 is mandatory and requires the assignment of Judge Farnell to preside at his resentenc-ing unless a showing of necessity is made for assignment of any judge “other than the judge who presided at the capital trial”
 
 *1162
 
 to preside at a sentencing proceeding. We disagree. Rule 8.700(c)(2) provides:
 

 (c) Sentencing Judge.
 

 [[Image here]]
 

 (2) Capital Cases. In any capital ease in which it is necessary that sentence be pronounced by a judge other than the judge who presided at the capital trial, the sentencing judge shall conduct a new sentencing proceeding before a jury prior to passing sentence.
 

 The rule simply requires that where a new judge is assigned to pronounce sentence in a capital case, there must be a new sentencing proceeding in front of a jury, which is exactly what occurred in this case — Muehleman was given a completely new sentencing proceeding in front of a jury. The rationale behind rule 3.700(c)(2) is that a substitute judge “who does not hear the evidence presented during the penalty phase of the trial must conduct a new sentencing proceeding before a jury to assure that both the judge and jury hear the same evidence.”
 
 Ferguson v. Singletary,
 
 632 So.2d 53, 55 (Fla.1993). We earlier stated this same principle in
 
 Corbett v. State,
 
 602 So.2d 1240, 1244 (Fla.1992), where we recognized the unique responsibilities of the sentencing judge in a capital case and concluded that “fairness in this difficult area of death penalty proceedings dictates that the judge imposing the sentence should be the same judge who presided over the penalty phase proceeding.”
 
 Id.
 
 at 1244. Moreover, “this Court has consistently applied the ‘clean slate’ rule to resentencing proceedings”... “[and a] resentencing is to proceed in every respect as an entirely new proceeding.”
 
 Merck v. State,
 
 975 So.2d 1054, 1061 n. 4 (Fla.2007) (citation omitted) (citing
 
 Preston v. State,
 
 607 So.2d 404, 408-09 (Fla.1992)). Muehleman’s resentencing proceeded as an entirely new proceeding, before a jury, in which Judge Downey heard all the evidence as to the circumstances of the murder and sentenced Muehleman accordingly-
 

 Because Judge Downey had jurisdiction to preside over the resentencing, which was conducted as an entirely new proceeding in front of a jury, relief is denied on this claim.
 

 Former Testimony of Unavailable Witnesses
 

 Muehleman
 
 next
 
 contends that the trial court erred in allowing the State to present the former testimony of several witnesses who testified in the first penalty phase proceeding but who were found to be unavailable at the time of the resen-tencing. The State presented investigator Scott Hopkins who testified that he conducted a search for witnesses Virginia Battle, the victim’s daughter, and Virginia Peterson, the victim’s friend. He discovered they were both deceased and them death certificates were admitted into evidence. Hopkins and his assistants also conducted an extensive search for Ronald Rewis, the jailhouse informant who taped conversations with Muehleman. Hopkins testified that Rewis could not be located and had not been heard from by his family since 1991. Government records also showed no activity for him since 1991. Assistant State Attorneys were allowed to read the testimony of Peterson, Battle, and Rewis. Muehleman does not challenge the finding of unavailability of these witnesses but contends that the State should not have been allowed to present the testimony through witnesses who were associated with the State Attorney’s Office. We find no error in the procedure followed by the trial court.
 

 A trial court’s decision to admit prior testimony is reviewed for abuse of discretion.
 
 See Thompson v. State,
 
 995 So.2d 532 (Fla. 2d DCA 2008);
 
 Outlaw v. State,
 
 269 So.2d 403, 404 (Fla. 4th DCA 1972). This standard is applied, however,
 
 *1163
 
 with due regard for the principles set out in
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Supreme Court in
 
 Craivford
 
 held that where an out-of-court testimonial statement is offered, it must be established that the defendant had the prior opportunity to cross-examine the declarant and that the witness must be shown to be unavailable.
 
 Id.
 
 at 68, 124 S.Ct. 1354. Section 90.804(2)(a), Florida Statutes (2003), similarly provided that former testimony may be received under certain circumstances, where the declarant is unavailable, as follows:
 

 (a) Former testimony. — Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
 

 Similar principles were also reflected in Florida Rule of Criminal Procedure 3.640(b) (1992), which was in effect at the time of resentencing.
 
 [12]
 
 In the case of a retrial in a criminal case, as occurred here with the new penalty phase proceeding, rule 3.640 in effect in 2003 provided:
 

 (b) Witnesses and Former Testimony at New Trial. The testimony given during the former trial may not be read in evidence at the new trial unless it is that of a witness who at the time of the new trial is absent from the state, mentally incompetent to be a witness, physically unable to appear and testify, or dead, in which event the evidence of such witness on the former trial may be read in evidence at the new trial as the same was taken and transcribed by the court reporter. Before the introduction of the evidence of an absent witness, the party introducing the evidence must show due diligence in attempting to procure the attendance of witnesses at the trial and must show that the witness is not absent by consent or connivance of that party.
 

 This Court, in
 
 Ibar v. State,
 
 938 So.2d 451 (Fla.2006), also explained the circumstances under which prior testimony will be allowed into evidence, stating as follows:
 

 The use of prior testimony is allowed where (1) the testimony was taken in the course of a judicial proceeding; (2) the party against whom the evidence is being offered was a party in the former proceeding; (3) the issues in the prior case are similar to those in the case at hand; and (4) a substantial reason is shown why the original witness is not available.
 

 Id.
 
 at 464 (quoting
 
 Thompson v. State,
 
 619 So.2d 261, 265 (Fla.1993)). Those same factors were established in this case. The prior testimony was taken in Muehleman’s first penalty phase, in a judicial proceeding, on the same issues, subject to cross-examination, and the unavailability of the witnesses was established.
 

 Muehleman’s complaint here is that the former testimony was read by persons associated with the State Attorney’s Office. No statute or rule dictates who must be utilized to read former testimony. Muehleman does not allege, nor does the record demonstrate, that the witnesses acted as advocates or attorneys in the trial, or that they shaded the testimony or
 
 *1164
 
 presented it in an improper fashion. Muehleman has cited only the fact that the readers were well-respected members of the State Attorney’s office, and that an especially well-respected assistant state attorney read the testimony of Rewis, the jail inmate, thereby allegedly adversely affecting the jury’s ability to evaluate the credibility of Rewis. However, this same complaint would appear to apply to anyone who might have read Rewis’s testimony, other than Rewis himself. Because Muehleman has not demonstrated that the procedure followed by the trial court violated the provisions of section 90.804, Florida Statutes, or the principles set forth in
 
 Crawford,
 
 we deny relief on this claim.
 

 Admissibility of Ronald Rewis’s Testimony
 

 Muehleman’s next claim asserts error in the admission of the former testimony of witness Ronald Rewis, a jail inmate incarcerated with Muehleman before he was charged with the murder. Rewis’s testimony, given at the first penalty phase and read into the record of the second proceeding, included incriminating statements that Muehleman made to him revealing details of the murder that had not been made public. The record establishes that Rewis was not recruited by law enforcement to obtain the statements, but did report Muehleman’s statements to the authorities, who then requested that Rewis wear a body bug to record any further statements Muehleman might make. Re-wis agreed and obtained a number of incriminating statements that were presented to the jury through his testimony. Muehleman objected to admission of this testimony on the grounds that the State should be precluded from presenting “false” testimony from this “jail agent.” He now argues on appeal that Rewis’s testimony violated his right against self-incrimination and right to counsel under
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 The claim Muehleman now makes is procedurally barred for two reasons. First, this specific contention was not made to the trial court below.
 
 See F.B. v. State,
 
 862 So.2d 226, 229 (Fla.2003) (stating that for an issue “to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below”) (quoting
 
 Steinhorst v. State,
 
 412 So.2d 332, 338 (Fla.1982)). Second, and more importantly, the very same issue Muehleman presents in this appeal was raised and ruled upon in the direct appeal from the first penalty phase. The law of the case doctrine bars consideration of those issues actually considered and decided in a former appeal in the same case.
 
 Fla. Dep’t of Transp. v. Juliano,
 
 801 So.2d 101, 107 (Fla.2001). In the first appeal, we stated:
 

 Muehleman’s next claim involves an alleged violation of his sixth amendment right to counsel. He contends that fellow inmate Ronald Rewis became a state agent for the impermissible purpose of acquiring incriminating evidence which properly lay beyond the state’s reach.
 
 Maine v. Moulton,
 
 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985);
 
 United States v. Henry,
 
 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). We find in this case no violation of Muehleman’s sixth amendment rights, as a review of the facts discloses that his incriminating admissions were not a product of a “ ‘stratagem deliberately designed to elicit an incriminating statement.’ ”
 
 Miller v. State,
 
 415 So.2d 1262, 1263 (Fla.1982),
 
 cert. denied,
 
 459 U.S. 1158, 103 S.Ct. 802, 74 L.Ed.2d 1005 (1983) (quoting
 
 Malone v. State,
 
 390 So.2d 338, 339 (Fla.1980),
 
 cert. denied,
 
 450 U.S. 1034, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981)).
 

 First, Muehleman, apparently eager to talk, approached Rewis and began to repeatedly attempt to discuss details of
 
 *1165
 
 the crime with him. Second, after unsuccessfully attempting to dissuade Muehle-man from “talking too much,” Rewis approached the authorities on his own initiative.
 
 Bottoson v. State,
 
 443 So.2d 962 (Fla.1983),
 
 cert. denied,
 
 469 U.S. 873, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984);
 
 Barfield v. State,
 
 402 So.2d 377 (Fla.1981). Third, Rewis was at that point instructed not to initiate any conversations with the suspect. Finally, no evidence exists in the record that Rewis’ efforts were induced by promises of any form of compensation. The contingent fee arrangement reflecting an improper relationship between police and informant in
 
 Henry
 
 is absent in this case.
 

 Muehleman v. State,
 
 503 So.2d at 314.
 

 Rewis’s testimony in the second penalty phase was identical to that presented on direct examination in the first penalty phase. Muehleman brought up the subject of the murder and persisted in talking about it even after Rewis attempted to dissuade him from doing so. The State did not approach him with a request that he get close to Muehleman to obtain the statements, and there is no evidence that Rewis was promised anything. Just as this Court found in the first appeal, Re-wis’s testimony was not the result of a State stratagem, Rewis was “instructed not to initiate any conversations with the suspect,” and “no evidence exists in the record that Rewis’ efforts were induced by promises of any form of compensation.”
 
 Muehleman,
 
 503 So.2d at 314. In
 
 Rolling v. State,
 
 695 So.2d 278, 291 (Fla.1997), we explained that whether a violation such as alleged here has occurred “turns on whether the confession was obtained through the active efforts of law enforcement or whether it came to them passively.” We also explained our holding in Muehleman’s direct appeal by stating:
 

 Likewise, in
 
 Muehleman v. State,
 
 we interpreted the “deliberately elicited” standard in terms of its plain meaning and found that the defendant’s right to counsel had not been violated because his statements were not a product of a “stratagem deliberately designed to elicit an incriminating statement.”
 

 Rolling,
 
 695 So.2d at 291 (citations omitted) (quoting
 
 Muehleman,
 
 503 So.2d at 314).
 

 We recognize that “[t]his Court has the power to reconsider and correct erroneous rulings [made in earlier appeals] in exceptional circumstances and where reliance on the previous decision would result in manifest injustice.”
 
 Parker v. State,
 
 873 So.2d 270, 278 (Fla.2004) (quoting
 
 State v. Owen,
 
 696 So.2d 715, 720 (Fla.1997)). However, Muehleman has provided no basis upon which we can conclude our prior ruling was erroneous or should be revisited.
 

 Because this claim is procedurally barred by Muehleman’s failure to raise it below and also by this Court’s decision in the first direct appeal, and because no exceptional circumstances or manifest injustice have been shown to require reversal of that ruling, relief is denied on this claim.
 

 Cumulative Error
 

 Finally, Muehleman claims that the cumulative effect of the alleged errors mandates that his sentence be reversed for a new penalty phase. Because Muehleman’s claims are individually without merit or are procedurally barred, his claim of cumulative error claim must fail. See
 
 Israel v. State,
 
 985 So.2d 510, 520 (Fla.2008) (“Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit.”); see
 
 also Williams v. State,
 
 987 So.2d 1, 14 (Fla.2008);
 
 Pooler v. State,
 
 980 So.2d 460, 473 (Fla.),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 255, 172 L.Ed.2d 192 (2008).
 

 
 *1166
 
 Proportionality of the Death Sentence
 

 Muehleman does not challenge the proportionality of his death sentence, but this Court reviews a death sentence for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006).
 
 See also
 
 Fla. R.App. P. 9.142(a)(6). Because the death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist,”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996), we make a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). Our review is not a quantitative analysis of the number of aggrava-tors versus the number of mitigators, but entails “a qualitative review” of the basis for each aggravator and mitigator.
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.
 
 See Bates v. State,
 
 750 So.2d 6, 12 (Fla.1999). The trial court found the following aggravators: (1) and (2) (merged) the murder was committed during a robbery and the murder was committed for financial gain; (3) the murder was committed to avoid lawful arrest or effect an escape; (4) the murder was especially heinous, atrocious or cruel (HAC); and (5) the murder was cold, calculated and premeditated (CCP). The trial court weighed these aggravators against the one statutory mitigating factor of the young age of the defendant at the time of the murder and concluded that, based on the circumstances of the murder, the ag-gravators vastly outweighed the one statutory mitigator, thereby justifying the sentence of death. We agree.
 

 The circumstances of the murder in this case show that Baughman was killed so that Muehleman could steal approximately $150 and various small items including a hat, shoes, a monogrammed lighter, and an 1886 silver dollar. Muehleman also admitted he took the job working for Baughman to steal money to return to Illinois, thereby establishing aggravators (1) and (2). Muehleman admitted that he killed Baugh-man because the victim could identify him; and he tried to conceal the blood-stained mattress and burned the bloody linens and Baughman’s wallet. The evidence showed that even before the murder, Muehleman set the table to make it appear the victim had eaten breakfast. Muehleman cleaned up the crime scene, concealed the body in the car trunk, and moved the car and body to avoid suspicion. These facts support ag-gravator (3) found by the trial court.
 

 The murder was not instantaneous. Muehleman admitted hitting Mr. Baugh-man with a cast iron frying pan, splattering blood around the room, while the victim pled with him to no avail. Muehleman then strangled Mr. Baughman for a lengthy period of time, which did not succeed in killing him, so Muehleman shoved plastic bags down his throat. Even then, the victim struggled and continued to try to breathe for several more minutes. These facts show that the murder was especially heinous, atrocious or cruel, as found in aggravator (4). Finally, the murder was carefully planned in advance. Muehleman tried to enlist the help of a friend in advance of the murder and he admitted to thinking about killing the victim for several hours while waiting for him to fall asleep. After trying to • suffocate Baughman with a plastic bag, Muehleman watched as the victim attempted to keep breathing. Clearly, the murder was cold,
 
 *1167
 
 calculated and premeditated, as found in the trial court’s aggravator (5).
 

 The Court has affirmed the death sentence in cases involving similar type murders, in which similar aggravation but even more mitigation was present. For instance, in
 
 Hoskins v. State,
 
 965 So.2d 1 (Fla.2007),
 
 cert. denied,
 
 — U.S.-, 128 S.Ct. 1112, 169 L.Ed.2d 827 (2008), the eighty-year-old victim was bludgeoned, strangled and raped. The trial court in
 
 Hoskins
 
 found HAC, which is “one of the most serious aggravators in the statutory sentencing scheme,” along with two other aggravators.
 
 Id.
 
 at 22 (quoting
 
 Douglas v. State,
 
 878 So.2d 1246, 1262 (Fla.2004)). After weighing the aggravators against one statutory mitigator, mental age, and fifteen nonstatutory mitigators, the trial court found that any one aggravator outweighed the mitigators and sentenced Hoskins to death.
 
 Id.
 
 at 6-7. This Court found the sentence proportionate and affirmed.
 

 In
 
 Beasley v. State,
 
 774 So.2d 649 (Fla.2000), also a bludgeoning death, the trial court found HAC, financial gain, and commission in course of a robbery. This was weighed against substantial statutory and nonstatutory mitigation. This Court found the death sentence proportionate and affirmed.
 
 Id.
 
 at 673. In
 
 Salazar v. State,
 
 991 So.2d 364 (Fla.2008),
 
 petition for cert. filed,
 
 (U.S. Dec. 11, 2008) (No. 08-7801), the defendant attempted to suffocate the victim for a period of time by taping a plastic bag to her head, but she was ultimately shot because it was taking too long.
 
 Id.
 
 at 369.
 
 [13]
 
 The trial court found that the aggravators of prior violent felony, HAC, CCP and commission during a burglary outweighed the six nonstatutory miti-gators. On appeal, this Court affirmed the death sentence, finding it proportionate.
 
 Id.
 
 at 380.
 

 Finally, in
 
 LaMarca v. State,
 
 785 So.2d 1209 (Fla.2001), the defendant waived counsel and waived presentation of any mitigation at the penalty phase of his trial. The trial court found only one aggravator (prior violent felony) and some insubstantial nonstatutory mitigation.
 
 Id.
 
 at 1216. On appeal, this Court found the sentence proportionate under the specific facts of the case.
 
 Id.
 
 at 1217.
 

 The instant case involved bludgeoning, strangling, and finally suffocating Earl Baughman. The trial comb found that the weighty aggravator of HAC, along with the CCP, financial gain, and avoid arrest aggravators, when weighed against only one statutory mitigator, supported a sentence of death. We agree and conclude that the death sentence in this case is proportionate.
 

 CONCLUSION
 

 After a complete review of all the issues raised by Muehleman, and after our own independent review of the proportionality of the sentence, we affirm Muehleman’s sentence of death.
 

 It is so ordered.
 

 WELLS, PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 QUINCE, C.J., recused.
 

 LABARGA, J., did not participate.
 

 [1]
 

 . Muehleman raised the following issues on direct appeal: (1)(A) the trial court erred in refusing to suppress statements Muehleman made to law enforcement authorities, to alleged state agent Ronald Rewis, and to reporter Christopher Smart, as the statements were the fruit of an illegal warrantless search, and some were obtained in violation of Muehleman's right to counsel and right to remain silent; (1)(B) the trial court erred in refusing to suppress physical evidence obtained from Muehleman and his garage apartment, as such evidence was the fruit of an illegal arrest, and was obtained without a warrant in violation of the Fourth Amendment; (2) Muehleman’s conviction and sentence should be vacated, as they were predicated upon inadmissible evidence; (3) Muehleman's absence from portions of the proceedings below violated his constitutional right to be present; (4) the trial court erred in allowing the State to introduce during the defense's case a document entitled "Juvenile Social History Report,” which was hearsay and contained prejudicial and irrelevant material, invaded the province of the jury, and violated the trial court's pretrial ruling on discovery; (5) the trial court erred in allowing the State to present during its case in rebuttal evidence of other crimes allegedly committed by Muehleman; (6) the trial court erred in permitting the State to introduce as rebuttal evidence the transcript of a taped interview with Richard Wesley; (7) the trial court erred in restricting Muehleman's presentation of evidence in mitigation and evidence relevant to the credibility of a key State witness; (8) the trial court erred in permitting the prosecutor to make a number of improper and prejudicial comments to the jury during his closing argument; (9) the trial court erred in giving incomplete and misleading instructions to the jury; and (10) the trial court erred in sentencing Muehleman to death because the sentencing weighing process included improper aggravating circumstances and excluded existing mitigating circumstances, rendering the death sentence unconstitutional under the Eighth and Fourteenth Amendments. Muehleman presented an additional issue via a supplemental brief claiming that his death sentence must be vacated because the record did not reflect that the trial court made the requisite findings of fact as to aggravating and mitigating circumstances prior to orally imposing the death sentence, and the trial court did not file written findings as to aggravating and mitigating circumstances until after it lost jurisdiction.
 

 [2]
 

 .
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
 

 [3]
 

 . In 1998, the trial court dismissed the Capital Collateral Representative as not providing competent representation and new counsel was appointed. Several months after being given new counsel, Muehleman sought a
 
 Far-etta
 
 hearing, which was held March 30, 1999. He was granted leave to represent himself by order of the trial court dated March 31, 1999. The relinquishment and public records litigation continued with Muehleman acting pro se until the case returned to this Court on May 9, 2001. The appeal resulted in the Court entering a September 17, 2002, order reversing the death sentence for an entirely new penalty phase.
 

 [4]
 

 .Mrs. Peterson and Mrs. Battle died before the resentencing and their testimony from the first trial was read into evidence at the resen-tencing.
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [6]
 

 . Rewis could not be located and was found to be unavailable for the resentencing. His testimony was read into the record at the second penalty phase hearing.
 

 [7]
 

 . In
 
 Muhammad,
 
 we emphasized “the duty of the trial court to consider
 
 all
 
 mitigating evidence ‘contained anywhere in the record, to the extent it is believable and uncontroverted.' " 782 So.2d at 363 (quoting
 
 Farr v. State,
 
 621 So.2d 1368, 1369 (Fla.1993)).
 

 [8]
 

 .Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [9]
 

 .
 
 Faretta v. California,
 
 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (holding that a trial court may not impose counsel on a "literate, competent, and understanding” defendant who has voluntarily waived his or her right to counsel). "[W]hen there is an unequivocal request for self-representation, a trial court is obligated to hold a
 
 Faretta
 
 hearing to determine if the request for self-representation is knowing and intelligent.”
 
 Tennis v. State,
 
 997 So.2d 375, 380 (Fla.2008).
 

 [10]
 

 . In light of the holding in
 
 Edwards,
 
 the Court now has under consideration an amendment to subdivision (d)(3) of rule 3.111, which would require the trial court, before finding a knowing and intelligent waiver of counsel, to determine that the defendant does not suffer from severe mental illness to the point where the defendant is not competent to conduct trial proceedings by himself or herself.
 
 See In re Amendments to Florida Rule of Criminal Procedure 3.111,
 
 No. SC08-2163 (Fla. petition filed Nov. 20, 2008). All other provisions of rule 3.111 would presumably remain unchanged.
 

 [11]
 

 . Muehleman filed Defendant's Motion for Chief Judge to Restore Proper Assignment of Original Presiding Judge to Case on January 21, 2003. The motion alleged in part that, without notice to the defense and without a valid reason, Judge Brandt Downey had "hijacked the assignment of the above captioned Capital case from its properly assigned original trial judge, and took it as his own case.” The motion sought the reassignment of Judge Farnell, the judge who presided in the first penalty phase and in the postconviction proceedings. The Chief Judge, David Demers, entered an order on February 6, 2003, denying the requested reassignment of Judge Far-nell to this case and stating that Judge Farnell had since rotated out of Division C, that Judge Downey was currently assigned to Division C, and that the proceeding was a new sentencing proceeding. The order stated that both judges were fully qualified to handle this case and there was no legal requirement that Judge Farnell be reassigned to the case.
 

 [12]
 

 . Rule 3.640 was amended in 2007 to remove subsection (b).
 
 See In re Amendments to the Florida Rules of Criminal Procedure (Three Year Cycle),
 
 942 So.2d 407 (Fla.2006). This subsection was found to have been superseded by the subsequently enacted evidence code, chapter 90, Florida Statutes, which addresses this subject.
 
 Id.
 
 at 408.
 

 [13]
 

 . Two victims were involved and both had bags taped to their heads and were shot, although one victim survived.
 
 Salazar,
 
 991 So.2d at 369.