PER CURIAM.
 

 Gary Bernard McCRAY, II, was convicted of four counts of first-degree murder for the May 23, 2004, shooting deaths of John Ellis, Jr., John Whitehead, Phillip Perrotta, and Robin Selkirk. Following a penalty-phase proceeding, the trial court sentenced McCRAY to death for each of the four murders. This is McCRAY’s direct appeal. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm McCRAY’s convictions and sentences of death.
 

 FACTS AND PROCEDURAL HISTORY
 

 In November 2004, McCRAY, who was twenty-four years old at the time of the crime, was charged with four counts of first-degree murder. McCRAY’s trial on these charges was delayed after the trial court found him incompetent to proceed and, as a result, ordered that he be hospitalized. During a second competency hearing, based on a written report received from the hospital stating that McCRAY had regained his competency, the court found that his competency had been restored. After a third and final competency hearing, in an order filed on September 2, 2008, the trial court found McCRAY competent to stand trial. McCRAYs guilt-phase proceeding began that same day.
 

 The Guilt Phase
 

 The evidence presented at trial established the following facts. In the early morning hours of May 23, 2004, a number of individuals were gathered inside Robin Selkirk and Phillip Perrotta’s Orange Park rental home. Prior to their deaths, Selkirk and Perrotta operated the residence as a “drug house” where people would purchase and sometimes use drugs. As the manager of the residence’s drug operation, Selkirk determined which drugs came into the house and those that were sold. McCRAY, a drug dealer nicknamed “Goldie,” routinely supplied Selkirk and the rental home with drugs, particularly crack cocaine. Selkirk would, in turn, distribute those drugs in exchange for money.
 

 
 *855
 
 At approximately 3 a.m., McCRAY approached the exterior of the rental home from a dark wooded pathway leading to the home’s screened-in back porch. Before entering the residence, McCRAY peered through the kitchen window and back doorway. He was dressed in black clothing, was wearing gloves, and had on a dark hooded sweatshirt with the hood placed over his head. Although McCRAY used some type of black material to cover his face, portions of his face remained visible, including his eyebrows, eyes, nose, and cheeks.
 

 During the time in which McCRAY surveilled the home’s back entrance, Eric Whitehead, Kevin Cunningham, and John Ellis, Jr., were awake and inside the rental home’s kitchen. Selkirk, Perrotta, and Eric Whitehead’s uncle, John Whitehead, were in the back bedrooms. After McCRAY completed his surveillance, he entered the home through the kitchen-door entrance, wielding what Cunningham described as an AK-47 rifle wrapped in black material. Both Eric Whitehead and Cunningham immediately recognized the gunman as McCRAY. As McCRAY moved into the kitchen, Cunningham exclaimed, “[D]amn, Goldie what did you get, a new weapon? Is that an AK-47?” Following this comment, McCRAY forced Eric Whitehead, Cunningham, and Ellis into the next room by pointing his rifle and verbally ordering the three men to the back of the house.
 

 After McCRAY forced the men into the dining room, he observed another individual, Eric Goodman, peering into the home through a kitchen window overlooking the back porch. Goodman, a coworker and friend of Perrotta’s, had witnessed McCRAY walk up to the residence from the wooded area abutting the home’s backyard moments earlier. Upon seeing Goodman, McCRAY pointed the rifle at him and demanded that he enter the house, but Goodman fled the scene. McCRAY then returned his attention to the people inside. He grabbed Cunningham by his ponytail, turned him around, and pushed him toward the living room. As soon as McCRAY observed Cunningham moving toward the front door, McCRAY again exclaimed, “[N]o. I said everybody to the back.” Thereafter, McCRAY grabbed Ellis by the front of his shirt, but Ellis freed himself from McCRAY’s hold and proceeded to run out of the home. McCRAY followed him, and during his pursuit of Ellis outside, several individuals inside the home dispersed.
 

 Cunningham fled the scene, and while doing so, heard “[a] volley of gunshots”— between ten and twenty in total. Eric Whitehead also fled and testified to hearing gun shots coming from the direction in which Ellis and McCRAY had run. Troy Wilson, who had been sitting on a couch in the living room and “riding out” a crack-cocaine high, got up, heard Ellis screaming, and then heard gunshots. Ellis’s dead body was later found with four gunshot wounds — one through the left ear, one through the left flank, one through the right thigh, and one through the left forearm — lying near a white Mustang parked on the front yard of the next door neighbor’s home.
 

 McCRAY subsequently returned, brandishing a handgun instead of the rifle he was seen carrying moments earlier. As he maneuvered toward the living room, McCRAY pointed the gun at Wilson, who, at the time, was still inside. When McCRAY reached the living room, however, Wilson escaped, running through the wooded area abutting the home’s backyard. During his escape, Wilson overheard screaming and around five or six more gunshots. Goodman, Cunningham, and Eric Whitehead positively identified McCRAY as the assailant. Although each
 
 *856
 
 admitted to suffering from crack-cocaine addictions, they testified that they were not under the influence of drugs when the shootings took place.
 

 Police responded to the scene of the crime after receiving a 911 call from a distressed neighbor, who claimed to have heard gunshots and two sets of footsteps running outside of his home. When police arrived, the bodies of the remaining victims, Selkirk, Perrotta, and John Whitehead, were discovered. Selkirk’s body was located in the carport area and had sustained two gunshot wounds to the back of the chest. Police found Perrotta’s body on the kitchen floor with a single, close-range gunshot wound to the head. John Whitehead’s body was located in one of the back bedrooms and had also sustained a single, close-range gunshot wound to the head. A friend of McCRAY’s testified to seeing McCRAY at sometime between 3:30 and 4:00 a.m. that morning wearing dark-colored clothing and with his hair styled in dreadlocks.
 

 Several days later, McCRAY shaved off his dreadlocks, fled the Clay County area, and drove to Tallahassee, where he was apprehended and arrested by U.S. Marshals for his connection to the murders.
 

 An examination of physical evidence recovered from the crime scene revealed several facts linking McCRAY to the shootings. Investigators found a dark sweatshirt along the dirt road leading to Selkirk and Perrotta’s rental home. Jason Hitt, a crime lab analyst with the Biology and DNA Section of the Florida Department of Law Enforcement (FDLE), testified that he extracted a DNA profile from the inside collar of the sweatshirt, the results of which established a partial DNA profile at nine of the thirteen loci that Hitt generally examines in such cases. Hitt then explained that all nine loci matched McCRAY’s DNA sample. He further opined that “based upon the results for the partial profile that was obtained on the sweatshirt you can expect to find that profile in ... one in 8 billion African Americans.” The actual murder weapons were never recovered.
 

 Additional information received by the Clay County Sheriffs Office was used by the State to establish McCRAY’s motive for these murders at trial. In February 2004, approximately three months before McCRAY’s shooting spree, the narcotics unit of the Clay County Sheriffs Office conducted a drug raid of Selkirk and Per-rotta’s rental home while executing a search warrant. Prior to that drug raid, the narcotics unit had received complaints about drug-dealing emanating from the Selkirk-Perrotta rental home, which was identified as a crack house. Detective Vincent Hall, the case agent, believed that McCRAY was the home’s main drug supplier. After executing the warrant, police arrested Selkirk, Ellis, Perrotta, Cunningham, John Whitehead, and McCRAY.
 

 The testimony further established that in the weeks leading up the May 2004 shootings, McCRAY questioned several people about the events surrounding his February 2004 arrest. About three weeks prior to the murders, McCRAY informed Travis Russell, an acquaintance of McCRAY’s, that he believed someone in the Selkirk-Perrotta rental home was wearing a wire at the time of his arrest. A week later, Goodman and McCRAY had a conversation while at the rental home, during which time McCRAY questioned Goodman about the events surrounding the February drug raid. Specifically, he asked whether Goodman knew if any individual arrested along with him was wearing a wire or acting as an informant for the police to aid in McCRAY’s conviction. McCRAY wanted to know if those individuals arrested along with him “were rolling over on him” because McCRAY felt he was
 
 *857
 
 getting a “heavier charge.” Goodman observed that McCRAY’s demeanor appeared to be distraught.
 

 Around the same time, McCRAY also had a discussion with his friend, Amanda Long, and a separate discussion with Cunningham regarding the February 2004 arrest. During his conversation with Long, McCRAY explained that he was going away for a long time after having been arrested at that house for having drugs. McCRAY informed Long that “he was going to find out who had said something about it” and who had alerted the police to him. In his conversation with Cunningham, McCRAY asked Cunningham if the police had mentioned him; Cunningham replied in the negative.
 

 To rebut the State’s case, the defense presented the testimony of Renee Herrera, a human geneticist and professor at Florida International University. Herrera’s testimony focused on sampling errors found in the statistical computations crime lab analysts use to compare DNA. However, on cross-examination, Herrera did concede that as the number of markers or sites increase — in this case, nine of thirteen — the probability of the tested DNA belonging to someone other than the DNA with which they compare it decreases. McCRAY also testified in the narrative against the advice of defense counsel.
 

 The jury found McCRAY guilty of four counts of first-degree murder for the murders of Ellis, Perrotta, Selkirk, and John Whitehead.
 

 The Penalty Phase
 

 On September 26, 2008, the trial court conducted a penalty-phase proceeding, during which both sides presented evidence before the jury. To establish the existence of aggravation, the State relied on all evidence previously presented to the jury during the guilt phase. In addition, the State presented victim impact statements from James Perrotta, the brother of Phillip Perrotta, and Traci Whitehead, the wife of John Whitehead.
 

 After the State concluded its presentation of victim impact testimony, defense counsel advised the court of its desire to present the testimony of two expert witnesses, Drs. Harry Krop and Steven Miller, to aid in establishing three areas of mitigation: (1) that McCRAY committed these felonies while he was under the influence of extreme mental or emotional distress; (2) the capacity of McCRAY to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; and (3) to provide “background dealing with Mr. McCRAY’s mental or emotional health.” Defense counsel then informed the court of McCRAY’s choice not to present the testimony of either expert. Consequently, the trial court questioned McCRAY in depth as to this decision, during which McCRAY reaffirmed his decision to not have the experts testify. Prior to closing arguments, the trial court again questioned McCRAY about his choice; McCRAY continued to instruct counsel not to allow the experts to testify, and the trial court abid-ed by that request.
 

 Although McCRAY initially expressed doubt as to whether other mitigation witnesses should be presented, he eventually authorized counsel to present the testimony of several members of his family and the mother of his children. Defense counsel first presented the testimony of two of McCRAY’s younger cousins, John Manning and Christopher Lewis. Manning testified that he considered McCRAY to be “a positive role model” and a father figure. Manning relayed that McCRAY’s family members loved and supported McCRAY, that he had never known McCRAY to act in a violent way, and that McCRAY’s life was worth saving. Christopher also depicted McCRAY as “a big brother.” He
 
 *858
 
 informed the jury that McCRAY was a positive influence on his life because he encouraged Christopher to stay in school and graduate. When asked by defense counsel if he understood that prior testimony had portrayed McCRAY as a supplier of drugs, Christopher explained that this was not the McCRAY with whom he had grown up; rather, McCRAY showed love and affection toward his family.
 

 McCRAY’s aunt, Veronica Lewis, and his father, Gary McCRAY, Sr., expounded upon McCRAY’s childhood. Veronica informed the jury that while growing up, McCRAY was very smart and performed well academically — he “had a promising future” — but McCRAY began to struggle following the death of several family members, including McCRAY’s great-grandmother. Veronica testified that since his arrest, McCRAY had become “a changed person” suffering from “mental diminishment”; in her opinion, McCRAY’s courtroom behavior during the trial was not indicative of McCRAY’s behavior growing up. Veronica finally noted that McCRAY was a good father who was very much a part of his children’s lives. McCRAY’s father, Gary, testified that McCRAY had to endure the separation between Gary and McCRAY’s mother at eight years old. Also, someone hit McCRAY in the eye with a baseball, the result of which took his vision. Like the testimony from McCRAYs aunt, Gary explained that since McCRAYs incarceration, he had become “withdrawn from life” and no longer trusted people. Ultimately, Gary expressed his opinion that if McCRAY were to serve a life sentence, he could contribute to his family and society.
 

 Terri Carter, the mother of McCRAYs three children, also testified. Carter’s testimony indicated that McCRAY loved his children, but that since his incarceration, he was “just not the same person.” Specifically, she mentioned: “The whole time since he’s been arrested he’s been in confinement aside from the time he went to the mental hospital, but he’s been confined and I’ve noticed a drastic change. He’s no longer the same person that I knew.” Carter concluded by giving the opinion that McCRAY’s life was worth saving because it would allow him to be a part of their children’s lives, who were only ages eight, six, and three.
 

 Finally, as in the guilt phase, McCRAY testified on his own behalf in a narrative form. McCRAY’s testimony focused on the trial court’s errors during trial, whether the evidence presented during the guilt phase was sufficient to convict him, and if the verdict should be overturned. In fact, at the conclusion of his narrative testimony, McCRAY expressly stated that “the testimony given before the Court today was not to consider why the defendant should get a life sentence but why the verdict should be overturned.” After defense counsel, the prosecutor, and the trial judge discussed the jury instructions, McCRAY chose to conduct his own penalty-phase closing argument, which again focused on a lingering-doubt argument instead of on mitigating and aggravating circumstances.
 

 Following the penalty-phase proceeding, the jury unanimously recommended sentences of death for each of the four counts of first-degree murder.
 

 The Spencer
 
 [1]
 
 Hearing
 

 At the October 22, 2008,
 
 Spencer
 
 hearing, both McCRAY and the State were given an opportunity to present additional evidence. The State presented the victim impact testimony of several individuals: Antha and Traci Whitehead, the daughter and wife, respectively, of John Whitehead; Mary Carol Allen, the mother of John
 
 *859
 
 Whitehead; Tonda Roselund, the sister of John Whitehead; Maxx Whitehead, the six-year-old son of John Whitehead; April Perrotta, the daughter of Phillip Perrotta; and Adeline Perri, the sister of Phillip Perrotta.
 

 Defense counsel introduced into evidence four expert reports for the purpose of establishing mitigation. The first report, a ten-page evaluation by mitigation specialist Shreya Mandel, recounted McCRAY’s life history, childhood and adolescent development, and the “debilitating family and social factors which shaped his life’s course.” Mandel’s evaluation stated that additional clinical evidence suggested that McCRAY was not accurately diagnosed with antisocial personality disorder. The second and third reports the trial court received were the same reports the court had accepted to determine McCRAY’s competency at the third and final competency hearing in August 2008. These reports included Dr. Krop’s August 15, 2008, psychological evaluation and Drs. Steven Miller and Wade Myers’ August 18, 2008, psychological evaluation, both of which opined that McCRAY was not competent to stand trial.
 

 The final report defense counsel submitted was a later report authored by Drs. Miller and Myers to advise the court as to mitigating circumstances. That report indicated that McCRAY’s behavior during the guilt and penalty phases of his trial strengthened the opinion that McCRAY was not feigning symptoms of mental illness. To conclude, the report expressed that “McCRAY has apparently been suffering from a Psychotic Disorder (not otherwise specified). His guardedness and lack of willingness to participate in evaluations has made it challenging to assess this. However, we have rich data ... that suggests that his guardedness is not feigned” and “consistent with the ‘prodro-mal’ phase of Schizophrenia (prodromal referring to the early constellation of symptoms that herald the later onset of a disease).” Accordingly, it was the doctors’ view that “there [was] a reasonable likelihood that Mr. McCRAY was experiencing extreme mental or emotional disturbance at and around the time of the offense, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.”
 

 The Sentencing Order
 

 Following the
 
 Spencer
 
 hearing, the trial court sentenced McCRAY to death for the murders, assigning “great weight” to the jury’s unanimous recommendation. In pronouncing McCRAY’s sentences, the trial court determined that the State had proven beyond a reasonable doubt the existence of two statutory aggravating circumstances, both of which it afforded “great weight”: (1) McCRAY was previously convicted of a capital felony; and (2) the crime was committed in a cold and calculated and premeditated manner, without any pretense of moral or legal justification (CCP). The trial court found no evidence to support any statutory mitigating circumstances.
 
 [2]
 

 
 *860
 
 The court did, however, find a total of seven nonstatutory mitigating factors, all of which it afforded “slight weight”: (1) McCRAY was raised without a mother figure for half his adolescence; (2) McCRAY was raised by an absentee father; (3) McCRAY was raised in a negative and unstable family environment; (4) McCRAY was raised in an environment that involved drugs; (5) McCRAY received his General Equivalency Diploma; (6) McCRAY lacked parental guidance; and (7) throughout his youth, McCRAY suffered from mental illness issues.
 
 [3]
 
 The trial court ultimately concluded that “the aggravating circumstances in this case far outweighed the mitigating circumstances” and sentenced McCRAY to death for each of the four murders.
 

 On direct appeal, McCRAY raises eleven claims.
 
 [4]
 
 In addition to addressing each of these claims, we also address whether there is sufficient evidence to support McCRAY’s convictions and whether the death sentence is proportionate.
 

 ANALYSIS
 

 McCRAY’s Competency to Stand Trial
 

 We first address McCRAY’s contention that the trial court erred by finding him competent to proceed following a third and final competency hearing. At the final competency hearing, two mental health experts opined that McCRAY was incompetent to stand trial; a third mental health expert testified that McCRAY was competent and malingering, or feigning mental illness. On appeal, the State argues that the trial court acted within its discretion by resolving conflicting testimony among the experts. We agree and deny relief as to this claim.
 

 The issue of McCRAY’s competency was first addressed in a hearing held on January 4, 2006. During the hearing, one men
 
 *861
 
 tal health professional, Dr. Krop, opined that there was sufficient evidence to suggest that McCRAY was incompetent to proceed. Another mental health professional, Dr. Myers, testified that McCRAY had an average IQ of 102 but diagnosed the defendant as having an adjustment disorder with disturbance of conduct, an antisocial personality disorder, a probable personality disorder, and possibly a psychotic disorder not otherwise specified and could be malingering. Based on this diagnosis, Dr. Myers found that McCRAY was incompetent to stand trial. Finally, a third mental health professional, Dr. William Meadows, opined that although McCRAY suffered from an antisocial personality disorder and a possible paranoid personality disorder, McCRAY was competent and malingering. The trial court subsequently found McCRAY incompetent to proceed and committed him to Florida State Hospital (FSH) in the custody of the Florida Department of Children and Families.
 

 In November 2006, FSH submitted a report to the trial judge presiding over this case explaining, in detail, that McCRAY’s competency had been restored and noting that his psychiatric condition was not a factor in his competence to proceed. The report recommended that McCRAY be returned to the court for a judicial determination and transferred back to the Clay County Jail for trial. Accordingly, on December 6, 2006, the trial court conducted a second, brief competency hearing, during which counsel for McCRAY and the State stipulated to the report’s conclusions. In light of this stipulation, the trial court issued a verbal order finding that McCRAY’s competency had been restored. McCRAY was then transferred back to the Clay County Jail for trial.
 

 After McCRAY’s behavior during jury selection again called his competency into question, a third and final competency hearing was held on August 22, 2008. The record reflects that throughout jury selection, McCRAY repeatedly interjected with his own commentary about the status of the proceedings, which ultimately led to his removal from the courtroom. At the competency hearing, the trial judge heard testimony from three mental health professionals, two of whom concluded that McCRAY was incompetent to stand trial. Dr. Krop testified that it was obvious that McCRAY did not manifest appropriate courtroom behavior and that he was unable to assist counsel in the preparation of this case. In Dr. Krop’s opinion, McCRAY was incompetent due to mental illness. Similarly, Dr. Miller, who worked with and received approval from Dr. Myers, testified that McCRAY was incompetent and suffering from a mental illness. In support, Dr. Miller explained that McCRAY lacked the ability to communicate effectively with his attorneys and that he suffered from a psychotic disorder not otherwise specified, an antisocial personality disorder, a probable paranoid personality disorder, and possible schizophrenia.
 

 In contrast, a third mental health professional, Dr. Meadows, reached the conclusion that McCRAY was competent to proceed to trial. Dr. Meadows described McCRAY’s behavior during jury selection as “organized,” “lucid,” “relevant and coherent.” According to Dr. Meadows, “there [were] clear indicators that [McCRAY] has been feigning mental illness and that he has an anti-social personality disorder in which he is oppositional but is in control if he chose to do so,” and that his conduct was “manipulative.” In an order filed on September 2, 2008, the date McCRAY’s trial began, the trial court found that based on the conflicting testimony, the experts’ respective reports and exhibits, defense counsels’ representations, and its own personal observations of
 
 *862
 
 MCCRAY’S courtroom behavior, McCRAY was competent to proceed to trial.
 

 “It is well-settled that a criminal prosecution may not move forward at any material stage of a criminal proceeding against a defendant who is incompetent to proceed.”
 
 Caraballo v. State,
 
 39 So.3d 1234, 1252 (Fla.2010) (citing
 
 Medina v. California,
 
 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). The test trial courts must apply in determining if a defendant is competent to proceed is “whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.”
 
 Peede v. State,
 
 955 So.2d 480, 488 (Fla.2007) (quoting
 
 Dusky v. United States,
 
 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); § 916.12(1), Fla. Stat. (2008); Fla. R.Crim. P. 3.211(a)(1). When expert testimony regarding a defendant’s competency is in conflict, this Court has traditionally afforded great deference to the trial court’s resolution of that factual dispute:
 

 “It is the duty of the trial court to determine what weight should be given to conflicting testimony.”
 
 Mason v. State,
 
 597 So.2d 776, 779 (Fla.1992). “The reports of experts are ‘merely advisory to the [trial court], which itself retains the responsibility of the decision.’ ”
 
 Hunter v. State,
 
 660 So.2d 244, 247 (Fla.1995) (quoting
 
 Muhammad v. State,
 
 494 So.2d 969, 973 (Fla.1986)). Thus, when the experts’ reports or testimony conflict regarding competency to proceed, it is the trial court’s responsibility to consider all the relevant evidence and resolve such factual disputes.
 
 See, e.g., Hardy [v. State
 
 ], 716 So.2d [761,] at 764 [ (Fla.1998) ] (citing
 
 Hunter,
 
 660 So.2d at 247).
 

 “Where there is sufficient evidence to support the conclusion of the lower court, [this Court] may not substitute [its] judgment for that of the trial judge.”
 
 Mason,
 
 597 So.2d at 779. A trial court’s decision regarding competency will stand absent a showing of abuse of discretion.
 
 See, e.g., Hardy,
 
 716 So.2d at 764;
 
 Carter v. State,
 
 576 So.2d 1291, 1292 (Fla.1989). Thus, the issue to be addressed by this Court is whether the circuit court abused its discretion in finding [the defendant] competent to proceed [at trial]. In addressing that issue, we are mindful that a trial court’s decision does not constitute an abuse of discretion “unless no reasonable person would take the view adopted by the trial court.”
 
 Scott v. State,
 
 717 So.2d 908, 911 (Fla.1998).
 

 Peede,
 
 955 So.2d at 488-89 (quoting
 
 Alston v. State,
 
 894 So.2d 46, 54 (Fla.2004));
 
 see also Hernandez-Alberto v. State,
 
 889 So.2d 721, 726 (2004); Fla. R.Crim. P. 3.211. To that end, even where conflicting evidence on an issue exists, this Court will not disturb the trial courts resolution of that factual dispute so long as it is supported by competent, substantial evidence.
 
 See Hernandez-Alberto,
 
 889 So.2d at 727.
 

 Upon review of the record, with special attention to the lack of cooperation exhibited by McCRAY, we conclude that that trial courts resolution of the factual disputes on the issue of McCRAY’s competency in its September 2008 order is supported by competent, substantial evidence. The experts’ evaluations received at the August 2008 competency hearing were in conflict. Although the three experts were unable to conduct personal interviews with McCRAY to prepare for the August 2008 competency hearing because McCRAY refused to cooperate, they relied on collateral data, including daily observation reports from the Clay County Detention Facility where McCRAY was awaiting trial, phone calls made by McCRAY to his mother following his outbursts on July 28, 2008,
 
 *863
 
 video of the July 28 jury selection process during which McCRAY repeatedly interjected, the jury selection transcript, and personal interviews with McCRAY’s mother and girlfriend. After reviewing this data, no expert could rule out the possibility that McCRAY was malingering.
 

 In resolving this conflict, the trial court personally observed McCRAY’s behavior in the courtroom and expressly relied on this observation as one basis for its determination. The trial court also relied extensively on Dr. Meadows’ expert opinion. The record shows that Dr. Meadows concluded that McCRAY’s display in the courtroom was feigned and manipulative. With respect to McCRAY’s speaking out in court, Dr. Meadows believed that while hostile, McCRAY did refer to what many antisocial psychopathic individuals also refer to — that “authority” was treating him “unfairly.” Specifically, Dr. Meadows opined that most of what McCRAY said during the jury selection process was “organized” and “lucid.” Although McCRAY “got agitated,” Dr. Meadows explained that “when you look at the entirety of the transcripts most of [it was] relevant and coherent.” In Dr. Meadows’ expert opinion, McCRAY’s behavior was not the result of a mental illness, but was rather the result of a severe personality disturbance, which would not lead to McCRAY being declared incompetent. As the trial court summarized, “While Dr. Meadows characterized the Defendant as having an antisocial personality [disorder], he found that the Defendant was competent and malingering likely because the Defendant is facing four counts of murder and a potential death sentence.”
 

 McCRAY argues that because the trial court relied extensively on the expert opinion of Dr. Meadows, it is clear the trial court disregarded the conflicting expert testimony offered by Drs. Krop and Miller. However, the order reflects that the trial court considered all the testimony introduced during the hearing in making its final determination. Although the experts disagreed with the ultimate conclusion regarding McCRAY’s competency, the trial court resolved that disagreement in favor of finding McCRAY competent. Accordingly, we conclude there is competent, substantial evidence to support the trial court’s resolution of the conflicting testimony and that the trial court did not abuse its discretion in finding McCRAY competent to stand trial following the third and final competency hearing.
 
 [5]
 

 McCRAY’s Self-Representation
 

 We next address McCRAY’s contention that the trial court failed to comply with the procedures the United States Supreme Court set forth in
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), during five different stages of the proceedings.
 
 [6]
 
 In direct contrast to the previous competency claim, in which appellate counsel asserts that McCRAY was incompetent to proceed with trial due to mental illness, in this series of claims, counsel alleges error in the denial of McCRAY’s five requests to represent himself. Specifically, McCRAY argues: (1) the trial court failed to conduct an inquiry
 
 *864
 
 pursuant to
 
 Faretta
 
 after McCRAY’s request for self-representation during the August 22, 2008, competency hearing; (2) the trial court’s
 
 Faretta
 
 inquiry following McCRAY’s request for self-representation raised in the middle of the State’s opening statement was constitutionally inadequate; (3) the trial court’s
 
 Faretta
 
 inquiry following McCRAY’s third request during the direct examination of the State’s first witness was also inadequate, and the trial court unconstitutionally imposed counsel upon him following that request; (4) the trial court failed to conduct a
 
 Faretta
 
 inquiry following McCRAY’s pro se request submitted through defense counsel after the State’s second witness testified; and (5) the trial court abused its discretion by allowing McCRAY to conduct his own penalty-phase closing argument absent a proper
 
 Faretta
 
 inquiry. We first discuss the legal standard applicable to requests for self-representation and then apply that standard to each subclaim.
 

 “Under the United States Supreme Court’s ruling in
 
 Faretta,
 
 an accused has the right to self-representation at trial. A defendant’s choice to invoke this right ‘must be honored out of that respect for the individual which is the lifeblood of the law.’ ”
 
 Tennis v. State,
 
 997 So.2d 375, 377-78 (Fla.2008) (quoting
 
 Faretta,
 
 422 U.S. at 834, 95 S.Ct. 2525);
 
 see also Pasha v. State,
 
 39 So.3d 1259, 1261 (Fla.2010). “[T]he Sixth and Fourteenth Amendments include a ‘constitutional right to proceed
 
 without
 
 counsel when’ a criminal defendant ‘voluntarily and intelligently elects to do so.’ ”
 
 Indiana v. Edwards,
 
 554 U.S. 164, 170, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (quoting
 
 Faretta,
 
 422 U.S. at 807, 95 S.Ct. 2525). As this Court has explained, “[bjefore the trial court can make a decision whether to permit the defendant to proceed pro se, the defendant’s request for self-representation must be unequivocal.”
 
 Tennis,
 
 997 So.2d at 378 (citing
 
 State v. Craft,
 
 685 So.2d 1292, 1295 (Fla.1996)). Moreover, once a defendant elects to make an unequivocal request for self-representation, pursuant to
 
 Faretta
 
 and this Court’s precedent, the trial court is obligated to hold a hearing “to determine whether the defendant is knowingly and intelligently waiving his right to court-appointed counsel.”
 
 Id.
 
 (citing
 
 Hardwick v. State,
 
 521 So.2d 1071, 1074 (Fla.1988)). “When reviewing a trial court’s handling of a request for self-representation, the standard of review is abuse of discretion.”
 
 Aguirre-Jarquin v. State,
 
 9 So.3d 593, 602 (Fla.2009). That being said, a trial court’s failure to take the preliminary step of holding a hearing on a defendant’s unequivocal pro se request results in per se reversible error.
 
 Tennis,
 
 997 So.2d at 379.
 

 1. McCRAY’s Request During the Competency Hearing
 

 McCRAY first alleges the trial court failed to conduct an inquiry pursuant to
 
 Faretta
 
 after he made a request for self-representation prior to the start of his third competency hearing. Before the competency hearing could begin, McCRAY, who was represented by counsel at the time, personally objected to the State’s commentary. The trial judge warned McCRAY not to object while represented by counsel, but McCRAY refused to accept the judge’s command and explained that he wished to represent himself along with counsel. The trial judge rebuffed McCRAY’s request, stating that he would not permit hybrid representation. However, McCRAY became increasingly adamant about this request and continued to interrupt the proceedings. Consequently, the trial judge had McCRAY removed from the courtroom.
 

 A reading of the record demonstrates that McCRAY’s first challenged request was not a request to proceed without counsel, but an equivocal request for hy
 
 *865
 
 brid representation whereby both he and his appointed counsel would be simultaneously permitted to try the case. While it certainly would have been in the trial court’s discretion to allow such a practice, McCRAY does not have a constitutional right to combine self-representation with representation by counsel or engage in any type of hybrid representation.
 
 See Mora v. State,
 
 814 So.2d 322, 328 (Fla.2002);
 
 see also Logan v. State,
 
 846 So.2d 472, 475 (Fla.2003) (“[T]he defendant, under appropriate circumstances, has the constitutional right to waive counsel and represent himself. The defendant has no right, however, to partially represent himself and, at the same time, be partially represented by counsel.” (quoting
 
 Sheppard v. State,
 
 391 So.2d 346, 347 (Fla. 5th DCA 1980))). Accordingly, the trial court did not in err in failing to conduct a
 
 Faretta
 
 inquiry.
 

 2. McCRAY’s Request During the State’s Opening
 

 Next, McCRAY contends that the trial court conducted a constitutionally infirm
 
 Faretta
 
 inquiry when he requested self-representation during the State’s opening statement and that his request for complete self-representation was not met by a
 
 Faretta
 
 inquiry at all. During the State’s guilt-phase opening statements, McCRAY interrupted the proceedings, and the trial judge had the jury exit the courtroom. McCRAY then requested that he proceed pro sé “right now at this time.” When the court informed McCRAY that he would have to choose to either represent himself alone or allow counsel to solely represent him, McCRAY explained that he wanted to represent himself and discharge his attorneys. The record reflects that McCRAY then vacillated between his decision to discharge counsel and to have counsel’s assistance in addition to allowing him to try the case.
 

 As the court began a
 
 Faretta
 
 inquiry, asking McCRAY about his education, his employment history, and whether he had any prior legal experience, the record shows that McCRAY reaffirmed his desire to engage in some form of hybrid representation. After the trial judge informed McCRAY that the law did not mandate that the judge allow hybrid representation, the judge then noted for the record that based on McCRAY’s conduct, McCRAY would have to be removed from the courtroom. Just before his removal, McCRAY exclaimed: “I don’t want my counsel.... I don’t want them to help me right now then.... I don’t prefer them to help me at all right now. I’d like to dismiss them all the way because I’m the head of the defense.” After McCRAY was removed, the jury returned to the courtroom, and the judge informed the jury that although McCRAY had been removed, McCRAY would be provided with a television with sound to view and hear the proceedings, and that at the conclusion of each witness’s testimony, defense counsel would be allowed to discuss witness testimony with McCRAY to determine if McCRAY would like to add anything.
 

 Based on this exchange, McCRAY now argues that the partial
 
 Faretta
 
 inquiry was improper and the trial court’s failure to engage in such an inquiry after he finally expressed his desire to “dismiss them all the way” before being removed from the courtroom warrants reversal. However, we do not accept that McCRAY’s requests, which vacillated between requests for self-representation and representation by counsel within the span of minutes, were the type of unequivocal statements needed to trigger a
 
 Faretta
 
 inquiry.
 
 See Waterhouse v. State,
 
 596 So.2d 1008, 1014 (Fla.1992) (explaining that a “defendant may not manipulate the proceedings by willy-nilly leaping back and forth” between choices of self-representation and legal counsel (quoting
 
 Jones v.
 
 
 *866
 

 State,
 
 449 So.2d 253, 259 (Fla.1984))). Because the record clearly reflects that McCRAY’s requests in this instance were not unequivocal, but ambiguous, the trial court was not obligated to take the preliminary step of holding a
 
 Faretta
 
 hearing, and we therefore deny relief as to this subclaim.
 

 3. McCRAY’s Request During the State’s First Witness
 

 McCRAY also contends that the trial court’s
 
 Faretta
 
 inquiry following his third request for self-representation, which was made in the middle of the State’s direct examination of its first witness, was inadequate and that the trial court unconstitutionally imposed counsel upon him following that request. The record shows that while the State was conducting its direct examination, defense counsel informed the trial court that McCRAY, who was being detained in the holding cell, desired to proceed pro se. Based on this information, the court had the jury exit and McCRAY return to the courtroom. The judge then expressly inquired of McCRAY: “[Yjou want to discharge your lawyers, is that what you’re telling me? ... And only you will represent yourself without counsel, correct?” McCRAY responded “yes” to both questions. The court followed by conducting a
 
 Faretta
 
 inquiry, asking McCRAY about his age, education, and experience in the legal field. As part of this inquiry, the court issued several admonitions, which informed McCRAY that he would be bound by the same rules of evidence and trial procedure by which attorneys are bound, he would not receive assistance from anyone, including the judge, and the penalty for the charges against him were serious (i.e., either life without parole or death). In light of these admonitions, the court asked McCRAY whether he still thought he should proceed pro se. McCRAY responded that he understood these warnings and noted that “[t]he case [was] very simple” and that he could “handle it” and “represent [himself] easily.” Accepting McCRAY’s statements, the trial court discharged counsel, but allowed them to remain as standby.
 

 The record reflects that the trial court never actually allowed McCRAY to represent himself or question any witnesses because after this colloquy, McCRAY refused to abide by the rules of criminal procedure, made repeated untimely and irrelevant objections, and attempted to introduce irrelevant evidence during the State’s case-in-chief concerning FDLE case tracking reports allegedly stolen from McCRAY’s cell. Consequently, the trial judge reinstated defense counsel and again removed McCRAY from the courtroom, stating that counsel would be permitted to discuss witness questioning with McCRAY while he was inside the holding cell. The jury then returned to the courtroom with McCRAY being represented by counsel. McCRAY now challenges the adequacy of the
 
 Faretta
 
 inquiry and the trial court’s decision to reinstate counsel.
 

 We question McCRAY’s assertion that a
 
 Faretta
 
 inquiry was even required under these circumstances because the record is clear that he never actually represented himself due to his own obstreperous behavior. However, even if McCRAY’s behavior could be interpreted as triggering
 
 Faretta,
 
 we would conclude that competent, substantial evidence supports the conclusion that McCRAY had a general understanding of his rights and that his decision to proceed without counsel was made with eyes open.
 
 See Potts v. State,
 
 718 So.2d 757, 760 (Fla.1998) (finding
 
 Faretta
 
 inquiry sufficient where “[competent substantial evidence supported] the conclusion that Potts had a general understanding of his rights and that his decision
 
 *867
 
 to proceed without counsel was made with eyes open”).
 

 In the
 
 Faretta
 
 decision itself, the United States Supreme Court advised:
 

 Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that “he knows what he is doing and his choice is made with eyes open.”
 

 422 U.S. at 835, 95 S.Ct. 2525 (quoting
 
 Adams v. United States ex rel. McCann,
 
 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942)). The Supreme Court recently reaffirmed the importance of
 
 Faretta
 
 as the “foundational ‘self-representation’ case” because the “Sixth and Fourteenth Amendments include a ‘constitutional right to proceed
 
 without
 
 counsel when’ a criminal defendant ‘voluntarily and intelligently elects to do so.’ ”
 
 Edwards,
 
 554 U.S. at 170, 128 S.Ct. 2379 (quoting
 
 Faretta,
 
 422 U.S. at 807, 95 S.Ct. 2525). In
 
 Potts,
 
 this Court explained that in assessing the validity of a waiver of counsel, “a reviewing court should focus not on the specific advice rendered by the trial court — for there are no ‘magic words’ under
 
 Faretta
 
 — but rather on the defendant’s general understanding of his or her rights.” 718 So.2d at 760. In
 
 Aguirre-Jarquin,
 
 9 So.3d at 602, we reaffirmed that principle of law, holding that what matters is not the words the trial court employs but rather that the record reflects a defendant who “makes a knowing and voluntary waiver of counsel.” Although acknowledging our approval of a standard colloquy for trial courts to utilize,
 
 [7]
 
 we stressed that “a trial judge is not required to follow the colloquy word for word”; rather, “the essence of the colloquy is to ensure that the defendant makes a knowing and voluntary waiver of counsel.” 9 So.3d at 602;
 
 see also McKenzie v. State,
 
 29 So.3d 272, 280-81 (Fla.),
 
 cert. denied,
 
 — U.S. -, 131 S.Ct. 116, 178 L.Ed.2d 71 (2010) (rejecting defendant’s claim that
 
 Faretta
 
 inquiry was defective because the court did not specifically inquire as to his criminal justice experience and noting that a precise colloquy, is not a constitutional prerequisite). Accordingly, the omission of one or more warnings in a particular case does not necessarily require reversal so long as it is apparent from the record that the defendant made an intelligent and knowledgeable waiver of his right to counsel.
 

 In this case, while the record demonstrates that the trial court’s inquiry was not as exhaustive as it could have been and did not follow the standard colloquy as written, the trial court’s inquiry satisfied the constitutional predicate for allowing self-representation. Specifically, the trial court inquired about McCRAY’s age, his education, and his experience in the legal field. The trial court also advised McCRAY of the seriousness of the charges against him, the potential sentence he might face if found guilty, that he would be on his own if he chose to pursue self-representation, and that he would be bound by the same rules of evidence and procedure with which lawyers must comply. In addition, during the courts discussion with McCRAY after he interrupted the States opening, the trial court inquired as to whether McCRAY had ever represented himself and asked about his previous work experience. Moreover, Judge
 
 *868
 
 Wilkes, who made this determination, had been previously and thoroughly apprised of McCRAY’s competency at a hearing on that precise issue conducted just several weeks prior, after which the judge found McCRAY competent to stand trial. Based on the record, competent, substantial evidence supports the conclusion that McCRAY’s decision in this instance was an intelligent and knowing waiver of representation by counsel.
 

 McCRAY also asserts that the trial court’s imposition of counsel upon him following this request warrants reversal. We disagree. The Supreme Court has recognized that there are limits on the right to act as one’s own attorney, and
 
 “Faretta
 
 itself and later cases have made clear that the right of self-representation is not absolute.”
 
 Edwards,
 
 554 U.S. at 171, 128 S.Ct. 2379. Accordingly, the trial court has the power to terminate a defendant’s self-representation if he continues to abuse the court system.
 
 Perry v. Mascara,
 
 959 So.2d 771, 773 (Fla. 4th DCA 2007);
 
 see also Amend, to Fla. Rule of Crim. Pro. 3.111(d)(2)-(3),
 
 719 So.2d at 877 (setting forth as part of model
 
 Faretta
 
 inquiry that (1) if the defendant demonstrates an unwillingness to abide by the rules of criminal law or courtroom procedure, the trial judge may terminate self-representation; or (2) if the defendant is disruptive in the courtroom that the judge can terminate self-representation and remove the defendant from the courtroom). Here, following McCRAY’s request, the trial court was faced with an obstreperous defendant who might well have attempted to further disrupt and obstruct the trial proceedings; McCRAY refused to cooperate and persisted in obstructionist conduct even after the trial court warned McCRAY that his commentary was improper. McCRAY’s chosen course made it practically impossible for the court to move forward with the proceedings. Given McCRAY’s uncooperative behavior, coupled with his history of disruption, we conclude that the trial court did not err in removing McCRAY and reinstating counsel.
 
 See United States v. Brock,
 
 159 F.3d 1077, 1079-81 (7th Cir.1998) (concluding that “when a defendant’s obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge’s discretion to require the defendant to be represented by counsel” and affirming the district court’s revocation of the defendant’s pro se status and mandating the appointment of counsel over the defendant’s wishes).
 

 4. McCRAY’s Request Made Through Defense Counsel
 

 We next address McCRAY’s claim that the trial court failed to conduct a
 
 Faretta
 
 inquiry following McCRAY’s pro se request submitted through defense counsel after the State presented the testimony of its second witness. In this instance, the record reflects that defense counsel represented to the court that while he was discussing matters with McCRAY in his holding cell, McCRAY expressed a desire to proceed without counsel. However, McCRAY’s statement that he wished to represent himself was coupled with his request that defense counsel conduct some type of investigation on the allegedly stolen FDLE case tracking reports to which McCRAY had previously referred. McCRAY apparently wanted defense counsel to bring in law enforcement officers to testify on this issue. When both of McCRAY’s comments are jointly considered, the record makes clear that McCRAY still sought to represent himself while simultaneously having counsel assist him. Accordingly, McCRAY did not make an unequivocal request for self-representation, a
 
 Faretta
 
 hearing was not required, and the trial court did not err in failing to conduct such a hearing.
 

 
 *869
 
 5. McCRAY’s Request During the Penalty Phase
 

 In his final Aareiia-related claim, McCRAY argues that the trial court abused its discretion by allowing him to give his penalty-phase closing argument because the request for self-representation was untimely, the trial court previously found that McCRAY was incapable of self-representation, he had been previously adjudicated incompetent, he frequently disrupted the proceedings, and he demonstrated a lack of understanding of the legal system. He also contends that the trial court conducted an inadequate
 
 Faretta
 
 inquiry after McCRAY elected to conduct his closing argument.
 

 Prior to penalty-phase closing arguments, defense counsel represented to the court that McCRAY again wished to address the jury. Counsel stated that he had advised McCRAY that if he chose to pursue this option, McCRAY would have to engage in self-representation. McCRAY acknowledged that he had spoken to counsel about this matter and that he wanted to give the argument. After the trial court informed McCRAY and defense counsel that it would only allow one of them to give a closing, McCRAY responded, “All right. Then I’ll do it.” The trial court then issued the following admonitions:
 

 THE COURT: All right. You understand that the argument is going to be limited to whether or not it ought to be death or life, don’t you? I mean what you did up here previously [i.e., McCRAY’s narrative, penalty-phase testimony discussing lingering doubt] was not proper but I allowed it anyway. You understand?
 

 [[Image here]]
 

 So when you get up for that closing argument you will limit your argument to whether the jury ought to recommend death or recommend life based on the mitigation and aggravation. I don’t know if you’re prepared to talk about that or not but that’s what you need to discuss, so would you rather that [defense counsel] do that or you want to do it?
 

 McCRAY responded that he understood these warnings and reaffirmed his decision to present the closing. The following exchange then took place:
 

 THE COURT: All right. You know that were down to final arguments, correct?
 

 McCRAY: Yes, sir.
 

 THE COURT: And you understand that [defense counsel] have been representing you throughout this trial, correct?
 

 McCRAY: Yes.
 

 THE COURT: And now at the final argument you want to do the final argument on behalf of yourself, correct?
 

 McCRAY: Yes.
 

 THE COURT: And you understand that you’re not trained in the law, correct?
 

 McCRAY: Yes.
 

 THE COURT: You didn’t go beyond what — what kind of education do you have?
 

 McCRAY: I have a 12th grade education.
 

 THE COURT: What does that mean? Did you go through high school?
 

 McCRAY: I graduated.
 

 THE COURT: All right. Did you go to college?
 

 McCRAY: No.
 

 THE COURT: How old are you?
 

 McCRAY: I’m 28.
 

 THE COURT: And what kind of work experience have you had over the years? Have you ever worked in the court system at all?
 

 
 *870
 
 McCRAY: No, I haven’t.
 

 THE COURT: You know the dangers and disadvantages of representing yourself?
 

 McCRAY: Yes, sir, I do.
 

 THE COURT: You understand that [defense counsel] is trained in law and has got many years experience handling these type cases?
 

 McCRAY: Yes, sir, I do.
 

 THE COURT: You understand he understands what to say to try to convince the jury to save your life?
 

 McCRAY: Yes, I do.
 

 THE COURT: You understand that you’re kind of at a disadvantage if you get up there and try to do that?
 

 McCRAY: Not really at a disadvantage.
 

 THE COURT: So you understand what you’re getting into here, right?
 

 McCRAY: Yes, I do.
 

 THE COURT: All right. Ill allow you to do it. All right.
 

 During his closing argument, McCRAY chose not to argue for mitigation at all; instead, McCRAY focused on lingering doubt. Thereafter, defense counsel resumed their role representing McCRAY for the remainder of the proceedings.
 

 As other courts have recognized, a trial court’s decision on a defendant’s belated request for self-representation after the trial begins is reviewed for an abuse of discretion:
 

 [S]ome federal courts have recognized that if a defendant proceeds to trial with counsel and asserts his right to self-representation only after a trial has begun, the court may deny the defendant’s request, or may otherwise limit or condition the request.
 
 [United States v. Singleton,
 
 107 F.3d 1091, 1096 (4th Cir. 1997).]
 
 See also United States v. Young,
 
 287 F.3d 1352 (11th Cir.2002).
 

 In Florida, it has been held that after a trial has begun with the defendant being represented by counsel, the decision of whether to allow a defendant to proceed
 
 pro se
 
 rests in the sound discretion of the trial court.
 
 Lyons v. State,
 
 437 So.2d 711 (Fla. 1st DCA 1983).
 

 When exercising this discretion, the trial court should make inquiry of the defendant as to why the defendant desires to represent himself. The trial court must then balance the legitimate interest of the defendant against the potential disruption of the proceedings already in progress.
 
 Id.
 
 at 712.
 

 Thomas v. State,
 
 958 So.2d 995, 996 (Fla. 5th DCA 2007). Moreover, where issues of mental health arise, “the Supreme Court in
 
 Edwards
 
 gave trial courts more discretion in the context of a
 
 Faretta
 
 inquiry to examine a defendant’s mental competency and mental capacity to represent himself.”
 
 Muehleman v. State,
 
 3 So.3d 1149, 1159 (Fla.2009) (citing
 
 Tennis,
 
 997 So.2d at 378).
 

 In
 
 Mora,
 
 814 So.2d at 328-29, this Court held that a trial court did not abuse its discretion in allowing defendant Mora to give a closing statement after his counsel had addressed the jury. On appeal, Mora argued that the trial court abused its discretion by offering to Mora the ability to become co-counsel even though there was significant testimony that Mora had a mental disorder.
 
 Id.
 
 at 328. Prior to trial, Mora had undergone a competency evaluation, after which the trial court found Mora competent to proceed.
 
 Id.
 
 at 325. Citing a trial court’s discretion in this regard, the Court found no merit in Mora’s argument.
 
 See id.
 
 at 328. In concluding that the trial court did not abuse its discretion in allowing Mora to give a brief closing statement, this Court relied on the following facts from the record:
 

 
 *871
 
 Here, the trial court engaged Mora in an extensive colloquy before allowing him to give a closing statement. During that colloquy, the trial court asked Mora what issues he was going to talk about, limited Mora to new issues not raised by [defense counsel], and suggested to Mora again not to give a closing statement. Mora stated that his attorney had advised him not to give a closing argument.
 

 Id.
 
 at 329.
 

 In this case, the record reflects that in January 2006, the trial court found that there was “substantial, clear and convincing information that [McCRAY]
 
 currently
 
 has a serious mental health illness or defect that has rendered him incompetent to proceed in this case
 
 at this time.”
 
 (Emphasis added.) Nearly three years later, McCRAY’s competency had been restored, and in September 2008, the trial court expressly declared McCRAY competent to proceed, and in doing so, never once found McCRAY to be suffering from a severe mental health illness. Here, as in
 
 Mora,
 
 the trial court questioned McCRAY before allowing him to give the closing. During the colloquy, the court informed McCRAY of the nature of a penalty-phase closing, warned McCRAY to limit his argument to whether the jury should recommend life or death based on the mitigation and aggravation, discussed with McCRAY that his attorneys were trained in the law and had many years of experience with these types of cases, explained that he would be at a disadvantage to argue the closing, and again inquired as to whether McCRAY understood that his role was to convince the jury to save his life.
 

 Based on the record, we reject McCRAY’s contention that the trial court abused its discretion because the court had previously observed McCRAY’s disruptive behavior, had repeatedly prohibited McCRAY from engaging in self-representation on prior occasions, and had commented that McCRAY was “not capable of representing [himself] in this type of case” following McCRAYs second request. First, while it is true that McCRAY disrupted various portions of his guilt-phase proceeding, he was never once removed during the penalty phase — the proceeding at issue — which occurred several weeks after the guilt phase. Second, the record shows that with McCRAY’s prior requests for self-representation, the court did not vacillate on its decision to allow McCRAY to proceed pro se; aside from his third request, McCRAY’s previous requests were all equivocal and the trial court did not err in failing to conduct any type of
 
 Faretta
 
 hearing. Third, the trial court’s limited comment about McCRAY’s ability to represent himself following the second request is not dispositive because it did not foreclose McCRAY’s continuing ability to make a clear and unequivocal declaration of any desire to assert a right of self-representation.
 
 See Bell v. State,
 
 699 So.2d 674, 677 (Fla.1997) (“We find that the judge’s limited comment that appellant was not competent to represent himself as counsel or co-counsel did not foreclose appellant’s continuing ability to make a clear and unequivocal declaration of any desire to assert a right of self-representation.”).
 

 Lastly, to the extent that McCRAY now relies on the inappropriate nature of his lingering-doubt argument made during the closing, we decline McCRAY’s invitation to engage in a post-hoc review of the trial court’s decision by considering statements made by McCRAY after the fact.
 
 See Muehleman,
 
 3 So.3d at 1160 (“[T]he fact that Muehleman was granted his request to represent himself, and subsequently chose to present no mitigation whatsoever, does not establish that the trial court erred in allowing him to follow that chosen path.”). In light of the foregoing, we conclude that the trial court did not abuse its
 
 *872
 
 discretion in allowing McCRAY to conduct his closing argument, even if it ultimately was to his own detriment.
 

 McCRAY also argues that even if the trial court did not abuse its discretion in allowing him to proceed, the court engaged in a constitutionally insufficient
 
 Far-etta
 
 inquiry. The record directly refutes this claim. Here, prior to McCRAY’s closing argument the trial judge took the following steps: he advised McCRAY of the penalty-phase closings limited scope (i.e., why the jury should not recommend death); he warned McCRAY that he was not trained in the law; he explained to McCRAY that his counsel was trained in the law and that giving his own closing would put him at a disadvantage; and he questioned McCRAY regarding his age and experience in the legal field.
 

 Further, the record reflects that during the guilt phase, which took place several weeks before, after one of McCRAY’s numerous requests to allegedly proceed pro se, the trial judge inquired as to his prior work history and informed McCRAY that he would be bound by the same rules of evidence and procedure with which lawyers must comply. While the courts colloquy concerning the dangers and disadvantages of self-representation may have been somewhat brief, which the State acknowledges, this Court has held that [i]t [is] enough for [the defendant] to be alerted generally to the difficulties of navigating the legal system.
 
 Potts,
 
 718 So.2d at 760 (second and third alteration in original) (quoting
 
 Hill v. State,
 
 688 So.2d 901, 905 (Fla.1996)). Accordingly, we deny relief as to this claim.
 
 [8]
 

 Limitation on McCRAY’s Narrative Testimony
 

 Next, McCRAY argues that the trial court’s limitation of his guilt-phase testimony denied him the fundamental right to testify on his own behalf and to present evidence in defense. In response, the State concedes that the introductory portion of McCRAY’s testimony was relevant, specifically referencing McCRAY’s discussion of an alibi, the reason he chose to cut his hair, why he decided to leave town and travel to Tallahassee, and that he did not, in fact, run from the police when he was arrested. The State asserts, however, that the remainder of McCRAY’s testimony, which was largely argumentative in nature, was inappropriate, and that the trial court did not abuse its discretion in terminating McCRAY’s continued commentary. We agree.
 

 “[T]he right to present evidence on one’s own behalf is a fundamental right basic to our adversary system of criminal justice, and is a part of the ‘due process of law’ that is guaranteed to defendants in state criminal courts by the Fourteenth Amendment to the federal constitution.” Ma
 
 saka v. State,
 
 4 So.3d 1274, 1284 (Fla. 2nd DCA 2009) (quoting
 
 Gardner v. State,
 
 530 So.2d 404, 405 (Fla. 3d DCA 1988)). That right includes, of course, McCRAY’s right to testify on his own behalf.
 
 See Rock v. Arkansas,
 
 483 U.S. 44, 51-52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). This Court has embraced the principle that “[a] criminal defendant’s right to testify is a fundamental right under both the Florida and United States Constitutions.”
 
 Morris v. State,
 
 931 So.2d 821, 833 (Fla.2006). While this right is necessarily of constitutional magnitude, it is not abso
 
 *873
 
 lute and may only be exercised within certain bounds: “[T]he right ‘may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.’ ”
 
 Bowden v. State,
 
 588 So.2d 225, 230 (Fla.1991) (quoting
 
 Rock,
 
 483 U.S. at 55, 107 S.Ct. 2704). One area in which the right to testify may be circumscribed is where a defendant chooses to disregard the rules of evidence.
 
 See Rock,
 
 483 U.S. at 56 n. 11, 107 S.Ct. 2704;
 
 Booker v. State,
 
 397 So.2d 910, 914 (Fla.1981) (“A defendant who takes the stand as a witness in his own behalf occupies the same status as any other witness, and all the rules applicable to other witnesses are likewise applicable to him.”);
 
 see also Wilson v. State,
 
 12 So.3d 292, 297 (Fla. 4th DCA 2009) (“The right to testify includes the right to testify fully, without perjury, to matters not precluded by a rule of evidence.”). Nevertheless, a procedural or evidentiary rule may not be applied in a manner so as to arbitrarily exclude material portions of a defendant’s testimony.
 
 Bowden,
 
 588 So.2d at 230-31 (citing
 
 Rock,
 
 483 U.S. at 55, 107 S.Ct. 2704).
 

 A criminal defendant’s right to testify overlaps with the trial court’s discretionary role in ruling on the admissibility of evidence. The trial court’s authority to impose restrictions on the presentation of evidence is recognized by Florida statute, which permits a trial court to “exercise reasonable control over the mode and order of the interrogation of witnesses and the presentation” in order to “[facilitate, through effective interrogation and presentation, the discovery of the truth” and “[a]void needless consumption of time.” § 90.612(l)(a)-(b), Fla. Stat. (2008). Further, a trial court has discretion to limit the presentation of evidence that is either irrelevant or outside the scope of a witness’s knowledge.
 
 See
 
 §§ 90.403, 90.604, Fla. Stat. (2008). However, the court’s discretion on evidentiary matters such as these must be constrained by a criminal defendant’s constitutional right to testify.
 
 See McDuffie v. State,
 
 970 So.2d 312, 324 (Fla.2007) (“A trial court’s discretion [in the limitation on cross-examination of witnesses], however, is constrained by the rules of evidence and by recognition of a criminal defendant’s Sixth Amendment rights.” (citation omitted)). When discussing the interplay between the two concepts, this Court has employed an abuse of discretion standard of review.
 
 See England v. State,
 
 940 So.2d 389, 404-05 (Fla.2006).
 

 In the present case, it is quite apparent from the record that McCRAY was permitted to testify for at least fifty minutes. Not only did McCRAY testify, but his narrative commentary continued at length with only minor interruption. The trial court authorized McCRAY to testify in the narrative because he refused to inform defense counsel about the substance of his testimony. Of McCRAY’s twenty-four-page commentary, it appears that only the first three pages were of any relevance or within the bounds of permissible testimony. Yet following this brief presentation of relevant information, McCRAY’s statements quickly turned from testimony to a lengthy argument regarding the weight of the evidence, the improper procedures in which the trial court engaged, why several State witnesses were unreliable, and how DNA evidence was stolen and did not prove the State’s case — some of which would be more appropriately raised during closing argument by defense counsel.
 
 See Merck v. State,
 
 975 So.2d 1054, 1061 (Fla.2007) (“Closing argument is an opportunity for counsel to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.”).
 

 After the State objected to the relevancy of McCRAY’s testimony, the trial court ordered McCRAY to move on. However, McCRAY ignored that order and returned
 
 *874
 
 to his irrelevant and argumentative commentary. Following a brief recess, the court informed McCRAY that it would only allow him to proceed if questioned by counsel, thereby placing a limitation on McCRAY’s continued testimony. The trial judge explained that his reason for doing so was to prevent McCRAY from simply making arguments. When McCRAY returned to the witness stand, the State made a standing objection as to relevance, which the trial court again acknowledged. After defense counsel informed the court that he would not question the defendant, McCRAY insisted on continuing his discussion of testimony offered by the State’s witnesses. The State acknowledged that it had cross-examination questions, but McCRAY repeatedly stated that his testimony had not ended, explaining that it was his “job to end [his] testimony.” As McCRAY began to discuss another eyewitness, defense counsel told McCRAY that it was time for the State to ask him questions. The court then repeated defense counsel’s explanation but McCRAY again exclaimed, “Not yet. No. It’s not time for the state.... The defendant’s testimony has not been finished yet at this time.” When the State informed the court that it was ready to proceed, McCRAY objected, telling the prosecutor to have a seat so the jury could return to the courtroom to listen to the duration of his testimony. Consequently, the court had McCRAY removed from the courtroom and made assurances that the television and sound were on in the holding cell; the jury was not present during this outburst.
 

 Based on the above, we conclude that the trial court was well within its discretion to control the mode and presentation of McCRAY’s testimony, especially in light of the fact that a large portion of McCRAY’s exhortation was completely irrelevant, outside the scope of his knowledge, or constituted impermissible argument.
 
 [9]
 
 Further, when confronted by the court about the propriety of his testimony, McCRAY provided no reasonable indication that he would end his irrelevant narrative and resume testifying about relevant matters.
 
 See United States v. Carter,
 
 410 F.3d 942, 951 (7th Cir.2005) (Simply stated, a criminal defendant does not have an absolute, unrestrainable right to spew irrelevant — and thus inadmissible — testimony from the witness stand.). Moreover, the record demonstrates that the trial court’s decision to terminate McCRAY’s testimony was not exercised in an arbitrary or unreasonable fashion,
 
 see Bowden,
 
 588 So.2d at 230-31, and McCRAY does not direct this Court to relevant facts about which he would have testified had the trial court allowed him to proceed. Accordingly, we conclude the trial court did not abuse its discretion in limiting McCRAY’s testimony, nor did the trial court encroach upon McCRAY’s right to testify and present a defense.
 
 [10]
 

 
 *875
 

 Prosecutor’s Closing Argument
 

 Next, McCRAY argues that the trial court erred in denying his motion for mistrial made on the ground that several of the prosecutor’s comments during his guilt-phase closing argument were both improper and inflammatory. Specifically, McCRAY argues that the prosecutor made an improper “Golden Rule” argument, employed an improper imaginary script, and used evocative language to incite the jury’s passions. After reviewing the record, we conclude that because the prosecutor’s challenged comments did not involve “Golden Rule” or prohibited “imaginary script” arguments or express evocative language that this Court has previously condemned, but were rather arguments reasonably drawn from or based on an analogy supported by the evidence, they were not improper.
 
 See Gonzalez v. State,
 
 990 So.2d 1017, 1028-29 (Fla.2008) (“The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.”). We also note that McCRAY did not contemporaneously object to any of these comments, and therefore reversal would only be proper if the arguments rose to the level of fundamental error, which these did not. Accordingly, we deny relief on this claim.
 

 Evidence of Collateral Acts
 

 In his next claim, McCRAY contends that the State violated the Williams
 
 [11]
 
 rule when it impermissibly made evidence of McCRAY’s collateral drug arrest and his role as a drug dealer a feature of the trial that exceeded the scope of the State’s “Notice of Other Crimes, Wrongs or Acts.” We reject McCRAY’s claim that this evidence is precluded by the
 
 Williams
 
 rule. We hold that the trial court did not abuse its discretion in admitting these collateral acts because they were relevant to establish McCRAY’s motive for the murders.
 

 Under the State’s theory of the case, McCRAY went to the Selkirk-Perrotta rental home on the morning in question and killed the victims in retribution for their role in his earlier arrest occurring approximately three months earlier. According to the State, the evidence demonstrated that McCRAY wanted to know who had informed on him. To establish this theory, the State sought to introduce evidence relating to McCRAY’s February 12, 2004, arrest at the site of the murders. Consequently, the State filed a “Notice of Other Crimes, Wrongs or Acts,” which argued for the admission of such evidence, including statements made by McCRAY to anyone during or after the arrest. McCRAY later filed a motion to exclude this evidence. At a hearing on the motion, the State argued that it would need to identify McCRAY as a “drug supplier of this house.” The State explained that McCRAY had been arrested for possession of cocaine in February 2004 and had informed several individuals that he wanted to find out who was responsible for alerting the police to his drug dealing. The State advanced that its purpose in offering the evidence was to establish McCRAY’s motive of retribution for the February arrest — “to show a jury why [McCRAY] chose to kill the people that he chose in that house and it relat[ed] directly back to that [February] drug raid.” The State further explained that McCRAY “was running a drug dealing operation,” that “[h]e got caught,” and that “[h]e was arrested.” The trial court did not exclude the evidence.
 

 At trial, the State presented evidence to the jury of the February 2004 drug arrest and ensuing drug raid. Detective Hall testified to his belief that McCRAY was
 
 *876
 
 the home’s main drug supplier and that after executing a warrant, the police arrested Selkirk, Ellis, Perrotta, Cunningham, and McCRAY. Goodman testified that John Whitehead was also arrested. Further, several other witnesses testified that in the weeks leading up to the May 2004 shootings, McCRAY questioned each of them about the events surrounding his February arrest and the other parties’ involvement in that arrest; McCRAY wanted to know who had alerted the police to him.
 

 As this Court recently explained in
 
 McGirth v. State,
 
 48 So.3d 777, 786-87 (Fla.2010):
 

 An appellate court will not disturb a trial court’s determination that evidence is relevant and admissible absent an abuse of discretion. Relevant evidence is generally admissible unless precluded by a specific rule of exclusion. There are two categories under which evidence of uncharged crimes or bad acts will be admissible — similar fact evidence, otherwise known as
 
 Williams
 
 rule evidence, and dissimilar fact evidence. The requirements and limitations of section 90.404 govern similar fact evidence while the general rule of relevancy set forth in section 90.402 governs dissimilar fact evidence.
 

 (Citations omitted.) The collateral crime evidence that McCRAY was a drug dealer who was arrested in a drug raid at the murder site was not similar fact evidence, and consequently, McCRAY’s claim does not constitute a true
 
 Williams
 
 rule claim. As explained below, the general rule of relevancy under section 90.402, Florida Statutes (2008), applies, and the evidence at issue was relevant to establish McCRAY’s motive for the charged crimes.
 
 [12]
 

 McCRAY appears to concede that evidence of his prior arrest was a permissible tactic to show motive. However, McCRAY asserts that the State’s use of the facts and circumstances surrounding the arrest and his role as a drug dealer was irrelevant. We disagree.
 

 This Court has previously approved of a trial court’s admission of evidence of a defendant’s prior drug dealing to assist in establishing motive.
 
 See, e.g., Jackson v. State,
 
 25 So.3d 518, 529 (Fla.2009),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 3420, 177 L.Ed.2d 332 (2010);
 
 Jorgenson v. State,
 
 714 So.2d 423, 427-28 (Fla.1998). Here, as in
 
 Jackson
 
 and
 
 Jorgenson,
 
 the evidence regarding the February 2004 drug raid and McCRAY’s role as a drug dealer was relevant to support the State’s theory of motive. McCRAY was in the business of regularly delivering and selling crack cocaine to the site at which the murders occurred, it was explained that all four victims were arrested along with McCRAY during the drug raid, and several witnesses testified that after his February arrest, but before the shooting spree, McCRAY had relayed some concern about the victims’ roles in his arrest. The fact that McCRAY was a drug dealer who supplied the home with drugs was evidence that helped to establish McCRAY’s relationship to the murder location and with the victims. It therefore placed the State’s theory that McCRAY murdered the victims for their role in his drug arrest into context. The trial court did not abuse its discretion in admitting such evidence, nor was the probative value of the ex-
 
 *877
 
 dence substantially outweighed by the danger of unfair prejudice.
 

 McCRAY also argues that the admission of his collateral acts impermissi-bly became a feature of the trial. “Regardless of relevancy of collateral crime evidence ... admissibility is improper where the probative value of the evidence is substantially outweighed by undue prejudice.”
 
 Hodges v. State,
 
 885 So.2d 838, 358 (Fla.2004). This Court has explained that “relevant evidence of collateral crimes impermissibly becomes a feature of the trial when the evidence transend[s] the bounds of relevancy to the charge being tried’ and the prosecution ‘devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant.’ ”
 
 Peterson v. State,
 
 2 So.3d 146, 155 (Fla.2009) (alteration in original) (quoting
 
 Conde v. State,
 
 860 So.2d 930, 945 (Fla.2003)). Where evidence does, in fact, become a feature of the capital trial, reversible error will result.
 
 See, e.g., Steverson v. State,
 
 695 So.2d 687, 687 (Fla.1997) (reversing Steverson’s conviction and death sentence because State’s presentation of excessive collateral crime evidence was unfairly prejudicial and became a feature of Steverson’s capital murder trial).
 

 During the course of trial, the State presented to the jury details about and surrounding McCRAY’s February 2004 arrest and the fact that McCRAY was a drug supplier to the home. However, in light of the accumulation of other evidence the State presented to prove the charged offenses and the defense’s own apparent theory that another drug supplier may have committed the charged offenses, we conclude that the State’s references to the collateral crimes did not “transcend[ ] the bounds of relevancy to the charge being tried” or “devolve[ ] from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant” so as to warrant a new trial.
 
 Conde,
 
 860 So.2d at 945 (quoting
 
 Williams v. State,
 
 117 So.2d 473, 475 (Fla.1960)). Accordingly, we deny relief on this claim.
 

 Removals from the Courtroom
 

 Next, McCRAY argues that the trial court erred in denying his motion for mistrial immediately following the guilt-phase charging conference, during which McCRAY pointed to “the cumulative effect of ... the removals and or his testimony.” This Court has “repeatedly held that [it] reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard.”
 
 Salazar v. State,
 
 991 So.2d 364, 371 (Fla.2008). Such a motion should be granted only “when it is necessary to ensure that the defendant receives a fair trial,”
 
 Cole v. State,
 
 701 So.2d 845, 853 (Fla.1997), and “when an error is so prejudicial as to vitiate the entire trial,”
 
 England,
 
 940 So.2d at 402.
 

 Under this claim, McCRAY essentially argues that the trial court’s decision to repeatedly remove him from the courtroom during trial and his own direct examination caused disruption, affected the fairness of the proceeding, and warranted the granting of a mistrial. “[I]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings .... ”
 
 Johnston v. State,
 
 27 So.3d 11, 28 (Fla.) (quoting
 
 Illinois v. Allen,
 
 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)),
 
 cert. denied,
 
 — U.S. -, 131 S.Ct. 459, 178 L.Ed.2d 292 (2010). To that end, in order to prevent an obstreperous defendant from disrupting trial, trial courts may be justified in removing that defendant from the courtroom.
 
 See Allen,
 
 397 U.S. at 343, 90 S.Ct. 1057 (“The flagrant disregard in the courtroom of elementary standards of proper conduct
 
 *878
 
 should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.”);
 
 see also Valdes v. State,
 
 626 So.2d 1316, 1321 (Fla.1993) (pronouncing that [tjrial judges must be given sufficient discretion to meet the circumstances of each case where a defendant disrupts the proceedings and that courts are justified in keeping defendant out of courtroom until satisfied that he would not further disrupt proceedings (internal quotation marks omitted)).
 

 In the case at bar, it is apparent from the record that the trial court did not arbitrarily decide to remove McCRAY from the courtroom. Rather, McCRAY’s misbehavior appeared to be volitional and continued notwithstanding the trial court’s repeated admonitions to remain silent. It also appears that each time McCRAY was actually removed, the trial court ensured that it was done outside of the jury’s presence. Further, while McCRAY was in the holding cell during the course of trial, defense counsel had the opportunity to meet with McCRAY after each witness testified. The court even permitted McCRAY to return to the courtroom on several occasions, and he was present for a majority of the guilt phase. Based on the record before us, and in light of McCRAY’s own obstreperous conduct throughout the guilt-phase proceeding, we conclude that the trial court did not abuse its discretion in denying McCRAY’s motion for mistrial.
 
 See Knight v. State,
 
 746 So.2d 423, 432 (Fla.1998) (holding that trial court did not abuse its discretion in removing defendant from courtroom where defendant’s “consistently obstinate behavior, which he undoubtedly knew would cause his exclusion from the courtroom, also border[ed] on invited error”).
 

 We note that after reviewing the entire trial record in this case, it is unquestionable that the trial court was constantly attempting to balance McCRAY’s rights to a fair trial, including his presence at trial, with the need to maintain an orderly proceeding without constant interference from a defendant determined to disrupt the process. Under a similar circumstance, the Supreme Court has aptly explained this dilemma:
 

 It is not pleasant to hold that the [defendant] was properly banished from the court for a part of his own trial. But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes.... But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the [trial court]....
 

 Allen,
 
 397 U.S. at 346-17, 90 S.Ct. 1057. At oral argument, defense counsel agreed that McCRAY was an extremely challenging defendant and suggested that it would have been preferable for the trial judge to have simply removed McCRAY from the courtroom and instead allowed counsel to confer with McCRAY after each witness. However, defense counsel candidly conceded that if the trial judge had excluded McCRAY altogether, this would have also served as a basis for an appellate attack. We have considered the record in its entirety and conclude that under the totality of circumstances present here, the trial
 
 *879
 
 judge did not err in removing McCRAY from the courtroom.
 
 [13]
 

 Penalty Phase Jury Instructions
 

 With this claim, McCRAY asserts that the trial court erred in instructing the penalty-phase jury using “Jury Instruction 7.11 Penalty Proceedings — Capital Cases,” which was promulgated at the time of McCRAY’s 2008 trial, but revised on October 29, 2009, following recommendations made by the American Bar Association (ABA) report entitled
 
 The Florida Death Penalty Assessment Report. See In re Standard Jury Instructions in Criminal Cases
 
 -Report
 
 No. 2005-2,
 
 22 So.3d 17, 19, 22 (Fla.2009). Specifically, McCRAY notes that the ABA report conveyed statistical findings that jurors did not understand their role and responsibilities when deciding whether to impose a death sentence and that those findings could have applied in this case, calling into question the reliability of the jury’s recommendations of death.
 

 McCRAY did not contemporaneously object to the jury instructions used during the penalty phase, and as a result, he failed to preserve this issue for appellate review.
 
 See State v. Weaver,
 
 957 So.2d 586, 588 (Fla.2007) (“Jury instructions are ‘subject to the contemporaneous objection rule, and absent an objection at trial, can be raised on appeal only if fundamental error occurred.’ ” (quoting
 
 Reed v. State,
 
 837 So.2d 366, 370 (Fla.2002))). Nevertheless, there was no error in giving the standard jury instructions. MeCRAY’s claim is analogous to the argument often asserted by defendants that Florida’s standard jury instructions unconstitutionally minimize and denigrate the role of the jury in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which this Court has repeatedly rejected.
 
 See, e.g., Smithers v. State,
 
 18 So.3d 460, 472 (Fla.2009) (rejecting Smith-ers’ claim that counsel was ineffective for failing to litigate the sufficiency of the jury instructions that were virtually identical to Jury Instruction 7.11 in part because they did not violate the mandates of Caldwell);
 
 Smith v. State,
 
 998 So.2d 516, 530 (Fla.2008) (acknowledging that this Court has “consistently rejected challenges” to the 7.11 standard jury instruction, “holding that it correctly advises the jury of its role and does not unconstitutionally denigrate it”). Accordingly, we deny relief on this claim.
 

 McCRAY’s Limitation of Mitigating Evidence
 

 Next, McCRAY essentially argues that the trial court failed to abide by the procedures set forth by this Court in
 
 Muhammad v. State,
 
 782 So.2d 343, 363-65 (Fla.2001), when McCRAY chose to limit defense counsel’s presentation of mitigating evidence during the penalty phase. “It is well established that a competent defendant may waive his right to present mitigating evidence in the penalty phase of his first-degree murder trial.”
 
 Ocha v. State,
 
 826 So.2d 956, 961 (Fla.2002). Nevertheless, in
 
 Muhammad,
 
 this Court set out several procedural safeguards for trial courts to apply when “the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence.” 782 So.2d at 363. Since
 
 Muhammad,
 
 this Court has made clear that a trial court is required to implement the
 
 Muhammad
 
 safeguards only in cases
 
 *880
 
 where there is a
 
 complete
 
 waiver of all mitigation and not where a defendant decides to simply limit mitigation.
 
 See Eaglin v. State,
 
 19 So.3d 935, 945-46 (Fla.2009) (recognizing that this Court draws a “distinction between the waiver of the right to present mitigation and the decision to limit mitigation” and noting that the extension of a trial court’s
 
 Muhammad
 
 duties applies “only to cases in which there is a complete waiver of all mitigation”);
 
 Boyd v. State,
 
 910 So.2d 167, 188-89 (Fla.2005) (concluding that defendant who testified during the penalty phase and also allowed his pastor to testify “did not waive all mitigation but only limited the matters presented on mitigation” and therefore
 
 Muhammad
 
 was inapplicable). In this case, McCRAY did not waive all mitigation. Although McCRAY prohibited counsel from presenting the testimony of two expert witnesses who could have assisted in establishing mental mitigation, McCRAY did permit counsel to allow four family members and the mother of his children to testify. For that reason, we conclude that
 
 Muhammad
 
 is inapplicable to this case and reject all aspects of this claim of error.
 

 Sufficiency of the Evidence and Proportionality Review
 

 McCRAY does not challenge the sufficiency of evidence of guilt nor the proportionality of his death sentences. However, in the direct appeal of a death-sentenced defendant, this Court has an obligation to review both the sufficiency of the evidence of guilt and the proportionality of the sentence, regardless of whether the defendant raises these issues.
 
 See
 
 Fla. R.App. P. 9.142(a)(6).
 

 Sufficiency of the Evidence
 

 “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006) (quoting
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001)). In this case, eyewitness testimony and physical evidence linked McCRAY to the crimes. The State presented the eyewitness testimony of Eric Goodman, Kevin Cunningham, and Eric Whitehead, all of whom were present at the time of the shooting spree and identified McCRAY as the assailant. Each of these witnesses recounted that, at the time of the shootings, McCRAY was wearing a hooded sweatshirt, and DNA retrieved from the inside collar of the hooded sweatshirt found at the crime scene produced a partial DNA profile at nine of thirteen loci, all of which matched McCRAY’s DNA sample. Therefore, based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Simmons,
 
 934 So.2d at 1111 (quoting
 
 Bradley,
 
 787 So.2d at 738).
 

 Proportionality
 

 In deciding whether death is a proportionate penalty, the Court conducts a comprehensive analysis to determine “whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citations omitted). Accordingly, this Court considers the totality of the circumstances and compares the present case with other similar capital cases.
 
 See Duest v. State,
 
 855 So.2d 33, 47 (Fla.2003) (quoting
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996)). This consideration entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a
 
 *881
 
 quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998). “In reviewing the sentence for proportionality, this Court accepts the jury’s recommendation and the trial court’s weighing of the aggravating and mitigating evidence.”
 
 Miller v. State,
 
 42 So.3d 204, 229 (Fla.2010),
 
 cert. denied,
 
 — U.S. -, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011).
 

 Here, the trial court found two aggravators as to the murders of each of the four victims, both of which were given great weight: (1) that the defendant was previously convicted of a capital felony; and (2) CCP. The trial court did not find any statutory mitigators, but it did give “slight weight” to the seven nonstatutory mitigators that it found had been proven. This Court has previously stated that, qualitatively, the prior violent felony aggravator, which rests on the contemporaneous murder convictions in this case, “is among the most serious and weighty.”
 
 Deparvine v. State,
 
 995 So.2d 351, 382 (Fla.2008). Likewise, it is well-settled that the CCP aggravator is one of the “weightiest aggra-vators” in Florida’s statutory sentencing scheme.
 
 Morton v. State,
 
 995 So.2d 233, 243 (Fla.2008);
 
 see also Pagan v. State,
 
 830 So.2d 792, 817 (Fla.2002).
 

 In this case, the trial court found that the evidence established two weighty ag-gravators and gave only slight weight to several other nonstatutory mitigating circumstances. Based on the specific facts and circumstances of the murders and the aggravators and mitigators found by the trial court, we conclude that when compared with other capital cases, the death sentences in this case are proportionate.
 
 See, e.g., Diaz v. State,
 
 860 So.2d 960, 971 (Fla.2003);
 
 Shellito v. State,
 
 701 So.2d 837, 845 (Fla.1997);
 
 Hill v. State,
 
 688 So.2d 901, 903, 907 (Fla.1996).
 

 CONCLUSION
 

 For the foregoing reasons, we affirm McCRAY’s convictions and sentences of death.
 

 It is so ordered.
 

 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 . McCRAY did not request that the jury be instructed on any statutory mitigating factor, but McCRAY did present evidence and argument to the trial court in his sentencing memorandum of law requesting four statutory mitigating circumstances: (1) the capital felony was committed while McCRAY was under the influence of extreme mental or emotional disturbance; (2) the capacity of McCRAY to ap-predate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (3) McCRAY's age at the time of the crime constitutes mitigation; and (4) the existence of any other factors in McCRAY's background that would mitigate against imposition of the death penalty.
 

 [3]
 

 . McCRAY also argued for the existence of three other nonstatutory mitigating factors: (1) McCRAY lacked emotional maturity and desensitized himself with drugs and alcohol; (2) McCRAY. had a difficult childhood and acted out in response to the instability in his life; and (3) McCRAY’s age of twenty-four when the instant crime was committed constitutes mitigation. However, the trial court found that none of these mitigating circumstances were proven and therefore assigned them no weight in determining the appropriate sentence to be imposed in this case.
 

 [4]
 

 . McCRAY raises the following eleven claims: (1) whether the trial court erred in finding McCRAY was competent to stand trial; (2) whether the trial court erred in failing to issue a written finding of competency after the court found McCRAY's competency had been restored pursuant to Florida Rule of Criminal Procedure 3.212(c)(7); (3) whether the trial court denied McCRAY’s multiple requests for self-representation in violation of
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); (4) whether the trial court violated the dictates of
 
 Faretta
 
 by allowing McCRAY to present his penalty-phase closing argument; (5) whether the trial court erred in terminating McCRAY’s narrative, guilt-phase testimony; (6) whether the trial court erred in denying McCRAY’s motion for mistrial based upon alleged improper prosecutorial misconduct during the State's guilt-phase closing argument; (7) whether the trial court erred in permitting the State to introduce collateral crime evidence; (8) whether the trial court erred in denying McCRAY's motion for mistrial and motion for new trial based upon the overall prejudicial nature of the trial; (9) whether the trial court erred in instructing the penalty-phase jury using the standard jury instructions promulgated at the time of trial; (10) whether the trial court violated this Court's holding in
 
 Muhammad v. State,
 
 782 So.2d 343 (Fla.2001), by (A) failing to order a presentence investigation report (PSI) and (B) assigning "great weight” to the jury’s recommendation of death where limited mitigation was presented; and (11) whether cumulative error occurred in this case.
 

 Because we find no individual error, we deny as without merit claim eleven that cumulative error occurred in this case.
 

 [5]
 

 . Because we have decided this issue adversely to McCRAY, we decline to address as moot his related argument that the trial court failed to issue a
 
 written
 
 order as required under Florida Rule of Criminal Procedure 3.212(c)(7) following the second competency hearing conducted on December 6, 2006. The second competency hearing took place well before the third and final competency hearing, which did produce a written order finding McCRAY competent to proceed.
 

 [6]
 

 . Although McCRAY argues this next claim as two separate issues, we jointly consider them for the purposes of this opinion.
 

 [7]
 

 .
 
 See Amend, to Fla. Rule of Crim. Pro. 3.11 l(d)(2)-(3),
 
 719 So.2d 873 (Fla.1998) (including as part of model colloquy that the judge explicitly state the pitfalls of self-representation, that the defendant’s access to legal resources will be limited while in custody, and that the defendant is not required to possess special skills in order to represent himself).
 

 [8]
 

 . To the extent that McCRAY argues that the trial judge’s inquiry did not thoroughly apprise him of his “legal handicap” based on McCRAY’s statement that he was ”[n]ot really at a disadvantage,” we reject this claim because McCRAY's response to the judge’s questioning did not render the judge’s colloquy constitutionally deficient.
 

 [9]
 

 . McCRAY also maintains that his discussions of DNA evidence and the fact that the witnesses were under the influence of drugs were relevant. However, he fails to explain why it . was within the bounds of the evidentiary rules and procedures for him to discuss such matters on his direct examination. The record does not reveal if McCRAY had any contact with the witnesses before the murders occurred nor does it indicate whether McCRAY was ever qualified as an expert to discuss DNA evidence.
 

 [10]
 

 . At oral argument, appellate counsel for McCRAY raised a new argument that McCRAY’s narrative testimony was de facto self-representation which triggered the need for a
 
 Faretta
 
 hearing. However, the trial court is only obligated to hold a
 
 Faretta
 
 hearing after an
 
 unequivocal
 
 request for self-representation is made.
 
 See Muehleman,
 
 3 So.3d at 1158. Because McCRAY did not make an unequivocal request to proceed pro se prior to giving his testimony, the trial court was not required to conduct a
 
 Faretta
 
 hearing, and this claim is without merit.
 

 [11]
 

 .
 
 Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [12]
 

 . Our conclusion that the evidence at issue is not similar fact evidence subject to section 90.404(2), Florida Statutes (2008), renders moot McCRAY’s argument that the State exceeded the scope of its "Notice of Other Crimes, Wrongs or Acts” under section 90.404(2)(c)l.
 
 See Victorino v. State,
 
 23 So.3d 87, 98 n. 8 (Fla.2009).
 

 [13]
 

 . To the extent that McCRAY also relies on his removal from the courtroom during the third competency hearing, such reliance is misplaced because' that hearing occurred outside the jury’s presence. We likewise reject the remainder of McCRAY’s argument on this issue (i.e., the trial court abused its discretion in denying his motion for a new trial following the guilt phase) because it is merely an attempt to recast his cumulative error claim, which we have already denied.